# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## JULY SESSION, 1999

**FILED**

October 8, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | **)** | **C.C.A. NO. 03C01-9811-CC-00388** |
| | **)** | |
| Appellee, | **)** | |
| | **)** | |
| | **)** | **BRADLEY COUNTY** |
| **VS.** | **)** | |
| | **)** | **HON. CARROLL L. ROSS,** |
| **ROBERT GOLDSTON,** | **)** | **JUDGE** |
| | **)** | |
| Appellant. | **)** | (DUI) |

ON APPEAL FROM THE JUDGMENT OF THE
CRIMINAL COURT OF BRADLEY COUNTY

FOR THE APPELLANT:

CHARLES P. DUPREE
Suite 104, Franklin Building
Chattanooga, TN 37411

FOR THE APPELLEE:

PAUL G. SUMMERS
Attorney General and Reporter

MARVIN S. BLAIR, JR.
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

JERRY N. ESTES
District Attorney General

SANDRA CONAGHY
Assistant District Attorney General
P.O. Box 1351
Cleveland, TN 37364

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# <u>OPINION</u>

The Defendant, Robert Goldston, was indicted by the Bradley County Grand Jury for driving under the influence following his involvement in an automobile accident which occurred on November 9, 1996. Prior to trial, he filed a motion to suppress the results of blood tests conducted at two different hospitals shortly after the accident. The trial court denied his motion. On April 9, 1998, the Defendant was tried by jury and found guilty of DUI. The trial court sentenced him to eleven months and twenty-nine days incarceration, with the balance suspended after ten days in jail, and fined him $600.00. He now appeals his conviction as of right, pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure.

The Defendant presents four issues on appeal, which we have consolidated into one issue: whether the trial court erred by allowing introduction of the results of his blood alcohol tests.[1] Although the Defendant in his brief enunciates four separate issues, he fails to argue each separately, instead condensing the four into one single argument. We therefore will address the four questions raised, although not separately argued, by the Defendant as one sole issue, the resolution of which will encompass analysis of all four questions.

---

[1] The issues presented in the Defendant's brief are: (1) the trial court erred by failing to grant the Defendant's motion for judgment of acquittal at the end of the State's proof and at the end of all proof; (2) the trial court erred by overruling the Defendant's motion to suppress the results of his blood alcohol tests; (3) the trial court erred by allowing introduction of blood test evidence without proof of chain of custody of the blood samples; and (4) the trial court erred by allowing introduction of blood test evidence without the consent of the Defendant, as required by Tennessee Code Annotated § 55-10-406(b). Tenn. Code Ann. § 55-10-406(b). Apparently, the Defendant's first issue also relates to the alleged error in admitting the blood test results.

On November 9, 1996, the Defendant, a police officer with the Cleveland Police Department, and his friend, Marcus Enos, were returning home from a night club in the Defendant's car. Shortly after 1:00 a.m., the Defendant lost control of his vehicle, which slid into an embankment across the street from an intersection. Law enforcement and medical personnel were dispatched to the site of the accident to administer aid.

Deputy Shaunda Efaw of the Bradley County Sheriff's Department was among the first to arrive. She recognized the Defendant, with whom she had worked, as the driver of the vehicle. Efaw testified at trial that although both the Defendant and his passenger had suffered serious injuries, both were conscious when she arrived. She also stated that when she questioned him, the Defendant responded that he was "okay."

Lieutenant Mike Boggess of the Bradley County Sheriff's Department was dispatched to the scene of the accident and arrived soon after Deputy Efaw. He explained that the intersection where the accident occurred had been the site of several accidents, enough that a fire hydrant which previously set at the intersection had been relocated to a position further down the road. Boggess testified that upon approaching the Defendant's car, he smelled an odor of alcohol emanating from the vehicle. He also recognized the Defendant, whom he knew from work. He stated that the Defendant, who was conscious and "realized [he'd] been in an accident," was "thrashing about like he was going to try to climb out" of the vehicle, so he encouraged the Defendant to stay still until an ambulance arrived.

Trooper Charles D. McVey of the Tennessee Highway Patrol also responded to the call concerning the Defendant's accident. He stated that he noted a "strong odor of alcoholic beverage about the vehicle" and skid marks approximately 168 feet in length, which crossed into the wrong side of the road, leading to the point of impact. He also testified that approximately an hour and a half after responding to the accident, he visited the Defendant at Bradley Memorial Hospital, where the Defendant had been transported by medical personnel after the accident, and asked the Defendant whether he would submit to a blood alcohol test. McVey stated that the Defendant responded by shaking his head, thereby declining the test.

However, despite the Defendant's refusal of the test, a blood alcohol test was administered on blood drawn from the Defendant at the request of Dr. Dewayne Knight, the physician who treated the Defendant at Bradley Memorial Hospital. Dr. Knight testified at trial that when the Defendant was brought to the hospital, he had major injuries to his head and face, in addition to other extensive injuries sustained in the accident, including two broken legs. According to Dr. Knight, the Defendant was "conscious, though somewhat confused" and "[t]here was a possibly [sic] history of loss of consciousness." In addition, Dr. Knight testified that the Defendant "had an odor of alcohol that was obvious" and described the Defendant as "combative and disoriented." He stated that because of the odor of alcohol, the Defendant's head injury, and the confusion exhibited by the Defendant, he ordered a blood alcohol test and a urine drug screen. While the results of the drug screen were negative, the blood alcohol tests indicated that the Defendant had a blood alcohol content of .25 percent at approximately 2:30 a.m., when the tests were administered.

-4-

Following his emergency treatment at Bradley Memorial Hospital, the Defendant was transported by helicopter to Erlanger Medical Center in Chattanooga, an acute care and trauma center, for further treatment. A second blood test was conducted at Erlanger Medical Center. Over objection by the defense, the trial court allowed testimony by Sue Robinson, an employee in the medical records department of the hospital, regarding routine reports prepared by physicians at the hospital for purposes of the Defendant's diagnosis. Robinson testified that the reports indicated the Defendant had a blood alcohol level of .179 percent at approximately 5:00 a.m. and that the Defendant suffered "E.T.O.H. intoxication." Dr. Knight explained that he understood this term to mean an "alcohol overdose."

The Defendant testified on his own behalf. He reported that he had invited friends to his home on the afternoon of November 9, 1996. He stated that they had snacks and alcoholic beverages, which he began to consume around 4:30 or 5:00 p.m. The Defendant admitted to drinking two beers and three or four shot glasses of brandy mixed with Coca-Cola. He claimed that he stopped drinking around 10:00 p.m. and recalled that he and Enos left his house to go to a club around midnight. He also recalled that it was raining and foggy when they left the club. He attributed the accident to the weather conditions that night, explaining that he was speeding somewhat and when he hit his brakes, his car "hydroplaned." He maintained that he did not believe his driving skills were impaired when he left the club. In addition, he testified that he did not remember refusing consent for blood alcohol testing at Bradley Memorial Hospital and in fact, stated that he did not remember conversing with Trooper McVey at all that night.

The Defendant contends that records concerning the results of his blood alcohol tests should not have been admitted at trial. He insists that blood samples were taken from him while he was unconscious and without his permission. Moreover, he complains that the State did not establish a chain of custody for the blood samples at trial. He argues that Tennessee Code Annotated § 55-10-406 should have prevented the introduction of his blood test results. This section prohibits the introduction of blood alcohol evidence in driving under the influence cases where the person from whom the blood was drawn was unconscious or "otherwise in a condition rendering that person incapable of refusal." Tenn. Code Ann. § 55-10-406(b). The exception to this rule is set forth in subsection (e), which states, "Nothing in this section shall affect the admissibility in evidence, in criminal prosecutions for aggravated assault or homicide by the use of a motor vehicle only, of any chemical analysis of the alcoholic or drug content of the defendant's blood which has been obtained by any means lawful without regard to the provisions of this section." Tenn. Code Ann. § 55-10-406(e).[2]

Despite the Defendant's contentions, we conclude that Tennessee Code Annotated § 55-10-406 does not apply in this case. In State v. Ridge, this Court held that § 55-10-406 has no applicability to procedures performed "pursuant to a medical rather than a law enforcement request." 667 S.W.2d 502, 505 (Tenn. Crim. App. 1982); see also State v. William Roy Hopper, No. 02C01-9612-CC-

---

[2] The Defendant also cites a portion of the United States Code which pertains to the "[c]onfidentiality of records." 42 U.S.C.A. § 290dd-2 (Supp. 1999). However, this section concerns records maintained in connection with "substance abuse education, prevention, training, treatment, rehabilitation, or research which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States" and as such, clearly does not apply in this case. Id.

00485, 1998 WL 17635, at *3 (Tenn. Crim. App., Jackson, Jan. 20, 1998) (stating that "Ridge clearly holds that blood drawn pursuant to a medical request and analyzed for blood alcohol content may be properly admitted into evidence"). The Defendant, however, argues that this case is distinguishable from Ridge in that Ridge involved a charge of vehicular homicide, while the Defendant was convicted of the crime of driving under the influence. Nonetheless, we are satisfied from a review of other cases applying the rule stated in Ridge that this rule is applicable in other types of cases as well. For example, in State v. Robert J. Kellet, No. 03C01-9401-CR-00002, 1995 WL 33903 (Tenn. Crim. App, Knoxville, Jan. 27, 1995), the defendant was convicted of driving under the influence. On appeal, the defendant argued, as does the Defendant in this case, that "the trial court erred by allowing the state to circumvent the spirit of Tenn.Code [sic] Ann. § 55-10-406 by admitting the results of the appellant's blood alcohol test, which was administered in the course of his medical treatment." Id. at *1. However, in Kellet, this Court relied upon Ridge in rejecting the defendant's argument, holding that § 55-10-406 does not apply to testing performed pursuant to a medical request. Id.

Having concluded that Tennessee Code Annotated § 55-10-406 does not bar the introduction of the blood test results in this case, we will now proceed to address the question of whether the records at issue were properly admitted under the business records exception to the hearsay rule. Rule 803 of the Tennessee Rules of Evidence establishes this exception:

> A memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular

practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used on this paragraph includes every kind of business, institution, association, profession, occupation, and calling, whether or not conducted for profit.

Tenn. R. Evid. 803(6).

We begin with analysis of the records from Bradley Memorial Hospital, the first hospital at which the Defendant received treatment. With regard to these records, the State presented the testimony of several hospital employees. Nancy Dees, the director of medical records at Bradley Memorial Hospital and the authorized custodian of the hospital's records, testified that the hospital maintains records on every patient visit to the hospital. She said that the records presented in this case were prepared by "personnel from Bradley Memorial Hospital, staff physicians, persons acting under their control, all in the ordinary course of business" and that they were "prepared near the time of the act, condition, or event recorded therein." She stated that the emergency room records were signed by the attending physician, Dr. Dewayne Knight. She explained that as an attending physician, Dr. Knight is not technically a hospital employee but reports to one and must complete his medical reports at or near the time of treatment of the patient before submitting the reports to the medical record department.

Dr. Fenton Scruggs, a pathologist and director of the hospital laboratory, also testified concerning the records from Bradley Memorial Hospital. Dr. Scruggs stated that according to the hospital reports, Debbie Crumley, a

laboratory assistant at the hospital, drew the Defendant's blood at 2:37 a.m. He stated that Debbie Talley, a laboratory technician, processed the blood at 2:52 a.m. He further testified that hospital employees must comply with a very strict procedure to identify and note the name of each patient whose blood is drawn.

Dr. Knight, who treated the Defendant for his injuries at Bradley Memorial Hospital, testified that the blood tests performed on the Defendant there were ordered as part of "the initial examination" and explained that he received the results of the test at approximately 3:00 a.m., almost immediately after the test was performed. He stated that such tests are routinely ordered in cases where incoming patients exhibit "altered mental status" and explained that each day hundreds of patients in the hospital have their blood drawn. He maintained that blood tests are generally "very trustworthy" and "accurate."

With regard to the blood alcohol test conducted at Erlanger Medical Center, the State presented testimony by Sue Robinson, a medical records librarian at the hospital. She testified that the records had been certified by a "custodian of medical records" and that although she had not actually certified the records at issue, she was a "duly authorized custodian of the records." When asked whether the records had been "prepared by the personnel of the hospital, staff physicians, or persons acting under their control in the ordinary course of the hospital business, and prepared at or near the time of the act, condition, or event reported," she responded yes.

Having reviewed the record in this case, we are satisfied that the medical records introduced here were properly admitted under the business records

exception to the hearsay rule. The records from both Bradley Memorial Hospital and Erlanger Medical Center were medical reports compiled by medical personnel with knowledge who were under a business duty to record the blood testing procedures and the results of the tests. The practice of both hospitals is to regularly compile such reports of hospital activities, and the Defendant's blood tests were conducted in the course of regularly conducted hospital activities. In addition, the State demonstrated that each of the reports concerning the Defendant's blood alcohol tests were made at or near the time of the testing, and the State presented the reports through testimony of the proper custodians of the records. Finally, we note that the spirit of this exception, to ensure the trustworthiness of evidence introduced as an exception the hearsay rule, has not been violated by introduction of these records. Hospital records kept daily for medical purposes and not prepared for the purpose of litigation are typically deemed reliable.[3]

Accordingly, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

---

[3] The Defendant does not specifically argue that admission of the medical records violated the Confrontation Clause of the Sixth Amendment of the United States Constitution or Article I, Section 9 of the Tennessee Constitution. In a recent case factually similar to this one, this Court analyzed this issue and concluded that introduction of such medical records did not violate the defendant's confrontation rights. State v. Richard A. Green, No. 03C01-9812-CC-00422, 1999 WL 592229, (Tenn. Crim. App., Knoxville, Aug. 9, 1999).

CONCUR:

-11-

_____
GARY R. WADE, PRESIDING JUDGE


_____
JOE G. RILEY, JUDGE