# IN THE COURT OF APPEALS OF TENNESSEE
## AT MEMPHIS
February 24, 2015 Session

## BROOKS MONYPENY, ET AL. V. CHAMROEUN KHEIV

**Appeal from the Circuit Court for Shelby County**
**No. CT00205012     Jerry Stokes, Judge**

---

**No. W2014-00656-COA-R3-CV - Filed April 1, 2015**

---

This is an appeal from a judgment entered on a jury verdict. The case arises from a motor vehicle accident. Appellant State Farm defended the case as the original plaintiffs' uninsured motorist carrier. The original plaintiffs subsequently died, one as a direct result of injuries sustained in the accident, the other some two years after the accident. The plaintiffs' children were substituted as plaintiffs/appellees. State Farm appeals the judgment on the jury verdict on numerous grounds, including: (1) denial of its motion for directed verdict; (2) scope of cross-examination; (3) denial of its motion for mistrial based upon inappropriate closing argument; (4) exclusion of notations on medical records; (5) various acts of alleged wrongdoing on the part of Appellees' attorneys; (6) jury instructions; (7) admission of medical bills for original plaintiff's long term assisted living expenses; (8) excessive verdict; (9) incorrect application of statutory cap on non-economic damages; (10) denial of credit for medical and death payments made by State Farm under the insurance policy; and (11) award of discretionary costs. Because there is material evidence to support the jury's verdict, and because the trial court did not abuse its discretion, we affirm and remand.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Robert L. Moore, Memphis, Tennessee, for the appellant, State Farm Mutual Insurance Company.

Thomas R. Greer and R. Sadler Bailey, Memphis, Tennessee, for the appellees, Brooks

Monypeny and David Monypeny; Donald Capparella and Tyler Chance Yarbro, Nashville, Tennessee, for the appellees, Robert Edwin Sadowski and John Russell Sadowski.

## OPINION

### I. Background

On March 11, 2012, Mr. Emil Sadowski and his wife, Kathryn Sadowski (together the "Sadowskis") were injured in an automobile accident. At the time of the accident, Mr. Sadowski was driving a 2000 Lexus RX3 SUV, in which Mrs. Sadowski was a front-seat passenger. The Sadowskis had just finished lunch near the Wolfchase Mall in Memphis and were exiting the mall onto Highway 64/Stage Road. As the Sadowskis' vehicle exited onto Highway 64, it was hit by Mr. Chamroeun Kheiv's 2005 Subaru Impreza,[1] which was traveling east on Highway 64. Mr. Kheiv had three passengers in his vehicle. At the time of the accident, Mr. Kheiv was 28 years old. Mr. Sadowski was 90 years old, and Mrs. Sadowski was 82 years old.

Prior to the accident, all of the evidence indicates that the Sadowskis were both in very good health despite their age. Mr. Sadowski was a diabetic, but he was able to care for himself and administer his insulin. Mr. Sadowski was also an avid exerciser, who rode his bicycle almost daily. He had undergone hip replacement surgery some years prior and had replaced his daily walks with bike rides. Likewise, Mrs. Sadowski was physically fit and mentally sharp. She and Mr. Sadowski ate lunch out at a restaurant most days. Mr. Sadowski also loved to drive. According to the testimony of family members, it was not uncommon for the Sadowskis to take day trips from Memphis to Little Rock or Nashville just to each lunch and drive around. There was no testimony that Mr. Sadowski's age had impaired his ability to safely drive. The couple was actively involved in their church, and they were also very involved with their family. At the time of the accident, the Sadowskis had been married for approximately thirty years, and it was the second marriage for both. Mrs. Sadowski had two children from her first marriage, Brooks Monypeny and David Monypeny. Mr. Sadowski had three children from his first marriage, Terri McCord,[2] Robert Edwin Sadowski, and John Russell Sadowski.

---

[1] Throughout the record, Mr. Kheiv's name is spelled "Kheiv" and "Khiev." For purposes of consistency, we will use the spelling contained in the original complaint, i.e., "Kheiv."

[2] Ms. McCord is not a party to this appeal.

The site of the accident, Highway 64, is a six-lane road, with a grass median in the center, separating the east-bound three lanes from the west-bound three lanes. The exit that Mr. Sadowski was using is designed to direct merging traffic into the right lane of Highway 64; however, it is possible for a vehicle to cross the three east lanes of Highway 64 from the exit to turn west onto Highway 64. As discussed *infra*, there is dispute as to whether Mr. Sadowski was turning right (east) onto Highway 64, or whether he was attempting to cross the three east lanes to go west onto Highway 64.

There was one eyewitness to the accident, Connie Taylor, an emergency room nurse from Nashville. She testified at the trial by deposition. Ms. Taylor stated that she was traveling east on Highway 64 in the middle lane, having just made a right turn from Germantown Road. According to her testimony, she saw Mr. Kheiv's vehicle in her rear-view mirror, coming up "very fast" behind her. She stated that she initially thought the Kheiv vehicle was going to hit the back of her car; however, according to Ms. Taylor, Mr. Kheiv passed her vehicle on the right and almost immediately collided with the Sadowskis' vehicle. After impact, the Sadowskis' vehicle came to rest between two utility poles that were just east of the Wolfchase Mall exit. The Kheiv vehicle crossed the median and came to rest on the far north side of Highway 64, facing west. Ms. Taylor testified that she parked her vehicle by the Sadowskis' vehicle and got out to render help. She stated that Mrs. Sadowski complained of shortness of breath, pain in her chest, and that she had a cut on her leg that was bleeding. According to Ms. Taylor, Mr. Sodowski was confused, asking "what happened," and had some apparent injury to his face.

The Sadowskis were taken, by ambulance, to Baptist Memorial Hospital. While at the hospital, both of the Sadowskis were treated by Dr. Kamul Jit Mohan, a board-certified internal medicine specialist. Dr. Mohan testified at trial that Mrs. Sadowski's injuries were more acute that Mr. Sadowski's. Mrs. Sadowski presented with a broken neck at her C7 vertebra and injury to the ligaments supporting her spine. She also sustained injury to her aorta, which resulted in blood leaking into the pericardium. Mrs. Sadowski went into cardiac arrest shortly after she arrived at the hospital and had to be resuscitated. Although Mrs. Sadowski's injuries would normally require immediate surgery, Dr. Mohan testified that she was not a surgical candidate because her blood pressure would not stabilize due to the aortic leak. She was placed on a ventilator to help her breath but could not be weaned off the ventilator due to the problems with her blood pressure. Dr. Mohan stated that when he attempted to lower the amount of oxygen she received, her heart would go into atrial fibrillation. Because Mrs. Sadowski could not be weaned from the ventilator, Dr. Mohan had to perform a tracheotomy. Mrs. Sadowski subsequently developed a trachea infection due to pseudomonas. The infection caused the area around the tracheotomy to become red and inflamed and to produce foul-smelling discharge. Dr. Mohan stated that, approximately two or three days after the accident, Mrs. Sadowski suffered a stroke that affected her right side.

3

A CT scan revealed that she had suffered one or two older strokes, but there is no evidence that these earlier ischemic incidents affected her daily life. Dr. Mohan stated that Mrs. Sadowski remained paralyzed on her right side. The stroke she suffered after the accident also resulted in the development of deep vain thromboses in her right leg and arm. Although the usual course of treatment would be blood thinners, Dr. Mohan testified that he could not give Mrs. Sadowski blood thinners because of her aortic injury. Accordingly, he had to insert a blood filter into her inferior vena cava. This resulted in additional pain, swelling, and stiffness in her right leg and arm.

Dr. Mohan further testified that after the first ten days in the hospital, Mrs. Sadowski was conscious and aware of her condition. He stated that from that point, "her suffering never stopped." She was prescribed very strong pain medications, including Dilaudid (which is six or seven times stronger than morphine, according to Dr. Mohan). Mrs. Sadowski suffered from depression and post traumatic stress disorder, which required psychiatric consultation and treatment with Xanax and Ativan. She developed a secondary infection, which Dr. Mohan called "healthcare acquired pneumonia." This required him to put her back on the ventilator. Mrs. Sadowski was also put on a feeding tube. Dr. Mohan and Mrs. Sadowski's family members testified that she had to be restrained at times because she would attempt to remove the tubes, which bothered her greatly. Due to her immobility, she developed decubitus ulcers. Although Mrs. Sadowski was moved to Baptist Restorative Care Hospital, a separate long-term acute care center, Dr. Mohan stated that she was still in an intensive care unit.

Unlike Mrs. Sadowski, Mr. Sadowski's injuries were not immediately life threatening. He presented at the hospital with back and chest pain. Approximately eight months prior to the accident, Mr. Sadowski broke his sternum in a fall. The chest pain was largely due to aggravation of the existing injury. Mr. Sadowski was, however, in a great deal of pain during his hospital stay. The family did not immediately tell Mr. Sadowski about the direness of Mrs. Sadowski's condition. Mr. Sadowski was discharged from the hospital on March 20, 2012 and was admitted to Baptist Rehabilitation in Germantown, where he was treated by Dr. Sunita Jain. Dr. Jain testified that Mr. Sadowski needed both physical and occupational therapies and required twenty-four hour nursing care. Dr. Jain opined that because Mr. Sadowski had no prior complaints of pain, the functional impairments that necessitated rehabilitation were likely caused by the accident. While at the rehabilitation center, Mr. Sadowski was assigned a case manager, social worker, and a counselor due to his agitation and increasing depression.

Although he had lived independently prior to the accident, Dr. Jain testified that Mr. Sadowski never improved beyond "supervision level," which required another person plus a walker for his daily functions. Accordingly, on the recommendation of his physicians, Mr.

4

Sadowski was discharged to Ave Maria assisted living center. The testimony indicates that Mr. Sadowski did not adjust well to assisted living; he called the center "jail" and fell into a deeper depression. In addition, although his cognitive function tested in the 77th percentile during his stay at the rehabilitation center, after he moved to assisted living, the evidence indicates that his mental health deteriorated fairly rapidly.

On May 8, 2012, the Sadowskis filed a complaint against Chamroeun Kheiv in the Circuit Court of Shelby County. In their complaint, the Sadowskis asserted that Mr. Kheiv was liable for their injuries due to various acts of common law negligence, violation of numerous statutes governing operation of a motor vehicle, and violation of numerous Shelby County and City of Memphis ordinances. Mr. Kheiv was not insured at the time of the accident. Accordingly, on or about June 6, 2012, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company ("State Farm," or "Appellant"), as Mr. Sadowski's uninsured motorist carrier, entered an appearance as unnamed parties.

On May 14, 2012, Mrs. Sadowski died as a result of the injuries she sustained in the accident. Thereafter, on August 8, 2012, her children, Brooks Monypeny and David Monypeny, as executors of Mrs. Sadowski's estate, and Mr. Sadowski, as her surviving spouse (together with Brooks Monypeny and David Monypeny, "Plaintiffs"), filed a joint motion to amend the complaint to add Mrs. Sadowski's children to the lawsuit and to add a claim for wrongful death and loss of consortium. Without objection by State Farm, the trial court granted the motion to amend the complaint, and the first amended complaint was filed on August 17, 2012. State Farm filed its answer to the first amended complaint on August 20, 2012.

On November 2, 2012, Mr. Kheiv's three passengers, Jake Pravongiengkham, Jessica L. Huynh, and Vuthy C. Srey, filed a separate complaint against Mr. Kheiv and Mr. Sadowski alleging personal injuries arising out of the March 11, 2012 accident. On December 28, 2012, Plaintiffs filed a motion to consolidate their case with that of the Kheiv passengers. The motion was granted by order of January 11, 2013. By consent order entered on October 18, 2013, the Kheiv passengers voluntarily dismissed their claims against Mr. Sadowki. The Kheiv passengers ultimately settled their complaint against Mr. Kheiv.

The case was tried to a jury on November 19 through 21, 2013. On December 13, 2013, the trial court entered its judgment on the jury verdict. The order provides, in pertinent part:

> [T]he jury returned a verdict in favor of plaintiffs. . . and the
> written jury verdict is incorporated herein by reference. . . .
> The jury found the defendant, Chamroeun Kheiv 85% at

fault, and the plaintiff, Emil Sadowski, 15% at fault.

The jury awarded Mr. Sadowki $1,050,000 in non-economic damages and $325,746 in economic damages. Based upon the jury's assessment of 15% fault to Mr. Sadowski, the trial court reduced these amounts by 15% and then applied the $750,000 statutory cap to the non-economic damages. Tenn. Code Ann. §29-39-102. Accordingly, Mr. Sadowski's damages were reduced to $1,026.884.10 ($750,000 in non-economic damages + $276,884.10 in economic damages). The jury awarded Mrs. Sadowski's estate $875,000 in non-economic damages and $473,378.08 in economic damages, which amounts were reduced, by 15% and the applicable statutory cap, to $750,700 and $402,371.36 respectively, for a total damage award of $1,152,371.36. In addition, the jury awarded Plaintiffs a total of $450,000 on their loss of consortium claims. The trial court reduced this amount by 15%, bringing the total loss of consortium damages to $382,500.[3]

On January 8, 2014, Mr. Sadowski filed a motion for discretionary costs, along with supporting documentation. Brooks and David Monypeny filed a separate motion for discretionary costs and supporting documentation on January 10, 2014. The trial court granted Mr. Sadowski's motion by order of February 25, 2014, awarding Mr. Sadowski $9,500.25 in discretionary costs. On February 28, 2014, the trial court entered an order granting David and Brooks Monypeny's motion for discretionary costs in part and denying it in part. The court awarded the Monypenys $5,247.90 in discretionary costs.

While the motions for discretionary costs were pending, on January 10, 2014, State Farm filed a motion for new trial, remittitur, or alternatively to alter or amend the judgment. The requirement of filing a motion for new trial is governed by Rule of Appellate Procedure 3(e), which provides, in part:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

---

[3] State Farm does not appeal the award to Mrs. Sadowski's estate, nor the $75,000 of the loss of consortium damages that were awarded to her children, David and Brooks Monypeny. As discussed *infra*, State Farm appeals the damages awarded to Mr. Sadowski, including the $375,000 in loss of consortium.

Accordingly, "in all civil cases tried to a jury, any ground not cited in the motion for new trial has been waived for the purposes of appeal." ***Waters v. Coker***, 229 S.W.3d 682, 689 (Tenn. 2007) (citing ***Boyd v. Hicks***, 774 S.W.2d 662, 625 (Tenn. Ct. App. 1989)). Furthermore, "[t]he issues presented in a motion for new trial must be specified with reasonable certainty so as to enable appellate courts to ascertain whether the issue was first presented for correction in the trial court; otherwise, the matter cannot be considered on appeal." ***Id***. (citing ***State v. Gauldin***, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987)). On our review, State Farm is compliant with the Tennessee Rule of Appellate Procedure 3(e) requirement in that the issues raised on appeal are set out with sufficient specificity in its motion for new trial. By order of March 7, 2014, the trial court denied State Farm's motion for new trial, remittitur, or to alter or amend the judgment.

State Farm filed its notice of appeal on April 4, 2014. Upon review of the appellate record, this Court determined that the order appealed was not a final judgment so as to confer jurisdiction on the Court under Tennessee Rule of Appellate Procedure 3. Specifically, we determined that the order appealed did not adjudicate the Plaintiffs' claims for punitive damages, nor did the order adjudicate the claims of Mr. Kheiv's passengers. Accordingly, on September 12, 2014, this Court entered an order, allowing Plaintiffs ten days to obtain a final judgment in the trial court. Pursuant to this order, on September 19, 2014, the trial court entered a supplemental order, adjudicating the remaining claims. The appellate record was supplemented to include the adjudicatory order.

While the appeal was pending, on November 26, 2014, Mr. Sadowski died, having never left the Ave Maria assisted living center. On December 5, 2014, State Farm filed a suggestion of death in this Court. By order of January 21, 2015, we granted a motion to substitute, as parties to the appeal, the Co-Executors of Mr. Sadowski's estate, his sons Robert Edwin Sadowski and John Russell Sadowski (together with Brooks and David Monypeny, "Appellees").

## II. Issues

State Farm appeals. It raises eleven issues as stated in its brief:

1. Whether the court erred by failing to grant a directed verdict in favor of State Farm on all issues;

2. Whether the court erred by allowing Chamroeun Kheiv to be cross-examined with the hearsay allegations of fault contained in the separate complaint filed against him on behalf of non-parties Jake Pravongienhkham, Jessica Huynh and Vuthy Srey

7

while at the same time denying State Farm the right and ability to prove that those allegations were subsequently voluntarily dismissed by these same parties. The error was then exacerbated by plaintiffs' counsel who highlighted these same hearsay allegations in closing argument;

3. Whether the court erred by denying the motion for mistrial made by defense counsel when plaintiff's counsel told the jury, during closing argument, that it should not be concerned about "where the money might come from" to pay a judgment against Mr. Kheiv, as this argument was a deliberate, improper allusion to insurance;

4. Whether the court erred by allowing only selected Baptist Memorial Hospital medical records into evidence while excluding from evidence trial exhibit 22 in which the statement is made and attributable to the plaintiff that "the reason he was there [in the emergency room] was failure to yield, hit by a car;"

5. Whether plaintiffs' counsel was guilty of acts of wrongdoing (a) by displaying photographs of Kathryn Sadowski during opening statement and then not offering those photographs into evidence; (b) by displaying selected medical records of Kathryn Sadowski with key words lifted and highlighted for the jury without subsequently offering those records into evidence; and (c) by telling the jury, during closing argument, that it should "send through your verdict a message."

6. Whether the court erred by instructing the jury concerning TCA §55-8-118[, i.e., "Overtaking and passing on right,"] when this statute was not applicable to the facts of this case.

7. Whether the court erred by allowing the introduction of the past and future "medical" expenses at the Ave Maria assisted living facility for Emil Sadowski in the absence of any proof that these expenses were (a) causally related to the automobile accident; and (b) consistent with the customary and prevailing charges in the community for the same or similar services.

8. Alternatively, State Farm says that the jury award to the

plaintiffs was excessive and not supported by the material evidence such that the court should remit the total damages awarded to the plaintiffs pursuant to T.C.A §20-10-102 . . . .

9. Whether the court erred by granting judgment on the jury verdict by applying principles of comparative fault to the total assessment of damages before reducing the non-economic damages to the statutory caps instead of first reducing the non-economic damages to the statutory caps and then applying the principles of comparative fault.

10. Whether the court erred by failing to reduce the total judgment in order to reflect pre-verdict payments made by State Farm to the plaintiffs totaling $5,000 in medical payments and $20,000 in death benefits.

11. Whether the court erred by awarding plaintiffs discretionary costs which included fees paid to treating physicians who testified either by deposition or live at trial.

### III. Standard of Review

The standard of review when examining a jury verdict approved by the trial court is whether there is any material evidence to support the verdict. Tenn. R. App. P. 13(d). To determine if material evidence supports the jury's verdict, the appellate court shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." ***Barnes v. Goodyear Tire & Rubber Co.***, 48 S.W.3d 698, 704 (Tenn. 2000) (citing ***Crabtree Masonry Co., Inc. v. C & R Constr., Inc.***, 575 S.W.2d 4, 5 (Tenn.1978)).

### IV. Analysis

### A. Directed Verdict

At the close of Plaintiffs' proof, State Farm moved for a directed verdict under Tennessee Rule of Civil Procedure 50.01.[4] Plaintiffs' theory of the case and contention is

---

[4] Tennessee Rule of Civil Procedure 50.01 provides:

that Mr. Kheiv was operating his vehicle at a high rate of speed, beyond the posted speed limit along Highway 64, and that he was passing Ms. Taylor's vehicle on the right when he collided with the Sadowski vehicle as Mr. Sadowski pulled into the right lane to merge onto Highway 64. State Farm argued that the Kheiv vehicle was "there to be seen" and that Mr. Sadowski apparently did not see the oncoming vehicle before proceeding onto Highway 64. As grounds for its motion for directed verdict, State Farm relied on *Tennessee Trailways, Inc. v. Ervin*, 438 S.W.2d 733 (Tenn. 1969) and made the following argument at trial:

> This accident was going to happen. . . . And it didn't matter if Mr. Kheiv was going 65 . . . or if he was going the speed limit. . . . [Mr. Kheiv] couldn't miss [Mr. Sadowski] in either scenario. This accident was going to happen.
>
> Now, the *Tennessee Trailways* case is directly on point. . . . [In that case,] [a]n accident reconstructionist testified. . . that . . . a bus was speeding down the highway, when a motorcyclist against the right-of-way coming out of a private drive entered the roadway in front of that speeding bus. . . . And when he did, the accident happened. At the close of plaintiff's case, the bus company . . . moved for directed verdict . . . . The Court . . . ruled in favor of the bus company.
>
> It went up to the Tennessee Supreme Court. And the Tennessee Supreme Court said, yes, under that situation, that exact same situation we have today, the proximate cause of the accident isn't speed. The proximate cause of the accident is the motorcyclist, the plaintiff, who pulled from a position of safety against the right-of-way. . . for that bus company and caused this accident to happen.

---

A motion for a directed verdict may be made at the close of the evidence offered by an opposing party or at the close of the case. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

> As a matter of law, the proximate cause of that accident was Mr. Sadowski. . . . Mr. Sadowski must be found to be guilty of fault because all of the testimony to this point, he didn't see Mr. Kheiv coming. And he has a duty under the law to see that which is there to be seen.

The trial court subsequently denied the motion for directed verdict, finding that the question of fault was one for the jury.

Directed verdicts are appropriate only when reasonable minds cannot differ as to the conclusions to be drawn from the evidence. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000); *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Ingram v. Earthman*, 993 S.W.2d 611, 627 (Tenn. Ct. App. 1998). A case should not be taken away from the jury, even when the facts are undisputed, if reasonable persons could draw different conclusions from the facts. *Gulf, M. & O.R. Co. v. Underwood*, 187 S.W.2d 777, 779 (Tenn. 1945); *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App.1995). A trial court may, however, direct a verdict with regard to an issue that can properly be decided as a question of law because deciding purely legal questions is the court's responsibility, not the jury's.

In appeals from a directed verdict, reviewing courts neither weigh the evidence, *Conatser v. Clarksville Coca–Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn.1992), nor evaluate the credibility of the witnesses. *Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 638–39 (Tenn. Ct. App.1993). Instead, they review the evidence in the light most favorable to the motion's opponent, give the motion's opponent the benefit of all reasonable inferences, and disregard all evidence contrary to that party's position. *Alexander*, 24 S.W.3d at 271; *Eaton*, 891 S.W.2d at 590; *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 199 (Tenn. Ct. App. 1999). A trial court may, however, direct a verdict with regard to an issue that can properly be decided as a question of law because deciding purely legal questions is the court's responsibility, not the jury's.

Concerning State Farm's reliance on the *Tennessee Trailways* case, in ruling on the motion for directed verdict, the trial court noted that "comparative fault change[d] how we look at these cases in measuring fault. [When *Tennessee Trailways* was decided] in 1969. . . we had simply fault, any fault or rule would prevent the plaintiff from prevailing." It is true that historically, Tennessee courts have applied the common law doctrine of contributory negligence, which barred recovery by plaintiffs whose own negligence contributed to their injury in any way. *Carroll v. Whitney*, 29 S.W.3d 14, 16 (Tenn. 2000) (citations omitted). However, in 1992, the Tennessee Supreme Court abandoned contributory negligence in favor

11

of a system of modified comparative fault. *McIntyre v. Balentine*, 833 S.W.2d 52, 56 (Tenn. 1992). In doing so, the Court sought a tighter fit between liability and fault. *Carroll*, 29 S.W.3d at 16. Under the new system, a defendant would only be liable for the percentage of damages that his or her own negligence caused. *Id*. at 16-17 (citing *McIntyre*, 833 S.W.2d at 58.) Additionally, the Court adopted the non-party defense, allowing juries to apportion fault to a culpable person or entity though they are not a party to the lawsuit. *McIntyre*, 833 S.W.2d at 58. The court recognized that without allowing participants in the negligent act to share in the apportionment of fault, the tight fit between fault and liability would be lost. *Carroll*, 29 S.W.3d at 20. Indeed, this Court has stated that, "[t]he trial court has the responsibility to apportion fault to anyone having a degree of culpability." *Lindgren v. City of Johnson City*, 88 S.W.3d 581, 585 (Tenn. Ct. App. 2002) (citing *Carroll*, 29 S.W.3d at 22; *Dotson v. Blake*, 29 S.W.3d 26 (Tenn. 2000); *Bervoets v. Harde Ralls Pontiac–Olds, Inc.*, 891 S.W.2d 905 (Tenn.1994)). Although the *Tennessee Trailways* case may be instructive on the issue of how much fault should be assigned to Mr. Sadowski, following the adoption of comparative fault in Tennessee, *Tennessee Trailways* does not, necessarily, preclude assignment of liability to Mr. Kheiv. In fact, the instant case is distinguishable from *Tennessee Trailways*, where the Tennessee Supreme Court held that there was "no doubt that plaintiff's intestate rode his motorcycle up to the intersection, either hesitated or stopped, and, with the bus in unobstructed view, suddenly and abruptly crossed the highway into the northbound lane to the point of collision." 438 S.W.2d at 735. Under this scenario, the Court reasoned that "whether the bus was traveling 73.5 miles per hour or 63 miles per hour, speed was not a proximate cause of the accident as a matter of law." *Id*. The Court stated that it was "plain that the immediate cause of the collision was not the speed of the bus; but apparently the sudden and heedless entry of plaintiff's intestate onto the north side of the highway." *Id*. As noted above, in reviewing the denial of a motion for directed verdict, this Court must view the evidence in the light most favorable to the motion's opponent, give the motion's opponent the benefit of all reasonable inferences, and disregard all evidence contrary to that party's position. *Alexander*, 24 S.W.3d at 271; *Eaton*, 891 S.W.2d at 590; *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d at 199. Applying this standard to the facts at bar, we conclude that unlike the plaintiff's intestate in *Tennessee Trailways*, who heedlessly pulled into the path of an observed vehicle, here, there is evidence that Mr. Sadowski may not have had the opportunity to observe the Kheiv vehicle as it approached from the west.

Turning to the evidence that was presented in support of Plaintiffs' case, Ms. Taylor testified that she was traveling in the middle lane of Highway 64 when Mr. Kheiv's vehicle came up suddenly behind her. Ms. Taylor testified that she thought Mr. Kheiv's vehicle was going to hit her car until the vehicle suddenly swerved into the right lane to pass her. She explained that as the Kheiv vehicle swerved, it was out of control, almost "fishtailing":

> As I remember, [the Kheiv vehicle] came up so fast behind me when I was looking in the rearview mirror I thought he was going to hit me. He swerved really sharp and came back and then hit the [Sadowski] car. That's why I said he was out of control because it was almost like a fishtailing.

Ms. Taylor went on to state that, once Mr. Kheiv swerved into the right lane of Highway 64, the collision happened "pretty immediately." There was no evidence that Mr. Sadowski failed to stop at the stop sign, and Ms. Taylor further opined that Mr. Sadowski could not have seen Mr. Kheiv's vehicle:

> Q. Could the SUV have seen–well, from the perspective of the SUV was there anyone else in the right-hand lane when they were making the turn?
>
> A. No. There was just the three of us right before the accident happened.
>
> Q. And the car that was coming up, it was coming up behind you, correct.?
>
> A. Uh-huh (Witness nods head affirmatively).

In making its motion for directed verdict, State Farm relied, *inter alia*, on its cross-examination of Plaintiffs' accident reconstruction expert, Rob Miller. State Farm presented Mr. Miller with a hypothetical that required him to assume that, if Mr. Kheiv's vehicle was just 33 feet away from Mr. Sadowski's vehicle and was only going 45 miles per hour (the posted speed limit on Highway 64) as opposed to 65 miles per hour,[5] the accident would still have occurred:

> Q [to Mr. Miller on cross-examination]. Mr. Sadowski never saw Mr. Kheiv at all, did he?
>
> A. That was his testimony to the officer and his statement to the officer he didn't know what happened.

---

[5] It was never established that Mr. Kheiv was traveling 65 miles per hour; accordingly, we assume that the 65 miles per hour used in the hypothetical was an estimation of his alleged speed based upon Ms. Taylor's testimony and the other facts surrounding the accident.

13

          \*                         \*                       \*

Q. If we back up Mr. Sadowski one half second as we did before that is going to put him at or just below the fog line, isn't it?

A. Yes.

Q. That is going to put Mr. Kheiv 33 feet away?

A. Yes, sir.

Q. Is Mr. Kheiv going to be able to miss Mr. Sadowski?

A. He couldn't miss him in either scenario.

It must be noted that the foregoing testimony is based upon a hypothetical scenario. Nonetheless, we must disregard all countervailing proof when reviewing a trial court's decision not to grant a directed verdict. *Alexander*, 24 S.W.3d at 271.

Concerning the actual circumstances of the collision, Mr. Miller testified that if Mr. Kheiv was not speeding when he changed lanes, he would not have been at the collision site and would have been observable by Mr. Sadowski:

Q. It has been said that speed doesn't matter, that the decision to pull out, in some ways it wouldn't have mattered what speed the Kheiv car was going. Would you agree with that?

A. No.

Q. Why not?

A. Well, but for excessive speed on the Kheiv vehicle there would have been no collision. If he's following behind Connie Taylor at 30 miles an hour, there's no collision. If he's driving even at 45 miles an hour there's probably not going to be a collision, because then he's further back down the road. Even if he's in the right lane at 45 miles an hour there's probably no collision because then Mr. Sadowski looks left and sees a vehicle in the right lane and doesn't pull out, so speed does

14

matter in this particular case.

The testimonies of Mr. Miller and Ms. Taylor bring this case in line with the case of ***Roberson v. Motion Industries, Inc.***, No. E2004-02310-COA-R3-CV, 2005 WL 1584035 (Tenn. Ct. App. July 7, 2005). In that case, defendant Travis Weathers testified that he stopped his vehicle at a stop sign and looked down the street both ways to see if there were any vehicles approaching. *Id*. at *3. Seeing that it was safe to proceed, he pulled onto the road, where his vehicle collided with plaintiff Carl Roberson's vehicle. *Id*. Relying on the ***Tennessee Trailways*** case, Mr. Roberson claimed that his allegedly excessive speed could not be a proximate cause of the accident. *Id*. at *3-*4. The jury found Mr. Roberson 38% at fault for the accident. The issues on appeal to this Court were whether Mr. Roberson's excessive speed was the proximate cause of the collision as a matter of law and whether the trial court erred by not directing a verdict under ***Tennessee Trailways***. *Id*. at *4-*5. This Court affirmed the trial court's denial of directed verdict and distinguished the ***Tennessee Trailways*** decision. *Id*. Specifically, we noted that the passengers of the bus at issue in ***Tennessee Trailways*** testified that the "motorcycle driver's entry onto the highway was 'sudden' and 'right in front' of the bus." *Id*. at *4. In contrast, Mr. Weathers testified that when he looked down the street, the only visible vehicle was a garbage truck that was not involved in the accident. *Id*. We held that "[i]f the jury credited Weathers' testimony, which apparently it did, then Weathers cannot be said to have pulled out in front of a vehicle which was in his unobstructed view." *Id*. at *4. We concluded that "[b]ecause there was evidence in the . . . case from which a jury could reasonably conclude that Mr. Roberson's vehicle was not yet in sight and therefore not visible when Weathers looked for oncoming traffic and that Weathers did not simply pull out in front of an observed vehicle, the above cases [which included ***Tennessee Trailways***]. . . are not controlling on the comparative fault issue." *Id*. at *5. Likewise, in the instant case, there is evidence from which the jury could reasonably conclude that Mr. Kheiv's vehicle was not in sight, either because it was still traveling behind Ms. Taylor's vehicle, or because it swerved into the right lane so suddenly that Mr. Sadowski could not have seen it before he proceeded onto Highway 64. Thus, there was sufficient conflicting evidence to create an issue of fact for the jury to decide. Accordingly, we conclude that the trial court did not err in its refusal to direct a verdict.

### B. Cross-Examination of Mr. Kheiv

In its second issue, State Farm asserts that the trial court erred by allowing Mr. Kheiv to be cross-examined concerning sworn allegations made by the three individuals who were passengers in his vehicle on the day of the accident. Mr. Kheiv was State Farm's witness; he was called to give his account of how the accident occurred. Contrary to Mr. Miller and Ms. Taylor's testimonies, Mr. Kheiv testified that he was proceeding down Highway 64 in the middle lane when the Sadowskis' vehicle pulled straight in front of his vehicle. Mr.

15

Kheiv testified that Mr. Sadowski was pulling across the three eastbound lanes of Highway 64 in an attempt to go west onto Highway 64. He further stated that the point of collision was in the middle eastbound lane and that he was never in the right lane where Plaintiffs assert the accident occurred. On cross-examination, Plaintiffs' lawyer questioned Mr. Kheiv about the differing versions. Mr. Kheiv was asked about the version of events offered by Ms. Taylor, the eyewitness. He responded that "she has her version; I have mine." Then, Plaintiffs' lawyer questioned Mr. Kheiv concerning the version of events offered in Mr. Kheiv's passengers' sworn complaint:

Q. Did Mr. Srey file a lawsuit against you?

A. Yes, he did.

Q. And did he say you were driving recklessly?

A. I don't know what he said.

Q. Did he say you were speeding?

A. I don't know what he said.

Q. Did he say you failed to maintain a proper lookout?

A. I don't know what he said.

Q. All right. Now, wait a minute. Let's get this straight. You got sued. You got sued by Mr. Srey, the passenger in your car, and your testimony to the Jury is that you don't know whether those allegations were made against you?

A. I don't remember him saying that.

Q. Well, do you want to read it or do you want me to read it to you or what? You got the complaint, didn't you, sir? Didn't you get it?

A. Yeah, I got it.

Q. You got served. Is this the kind of thing that happens to you every day?

16

A. No.

At this point in the cross-examination, State Farm's lawyer objected and the following bench conference was held outside the hearing of the jury:

MR. MOORE [State Farm's lawyer]: Objection. Hearsay. He's been cross examined about allegations outside of this courtroom.

\*                                          \*                                          \*

MR. BAILEY [lawyer for Mrs. Sadowski's estate]: This is not being introduced for the truth of the matter asserted. This is being introduced to show that other people obviously had a different perception of this than he did. And he knows that he got sued and that he acknowledged it and didn't answer any–didn't cooperate in any way.
        This is all highly relevant to show the kind of person Mr. Kheiv is with regard to–

THE COURT: You're seeking to introduce the document [i.e., the complaint filed against Mr. Kheiv by his passengers]

MR. BAILEY: No. I'm not going to introduce the document. I'm just going to cross examine this witness.

THE COURT: Objection overruled.

MR. MOORE: As I understand it–

THE COURT: Hang on a second.

MR. MOORE: As I understand it from what he just said he's trying to introduce it to show the state of mind of these passengers. And the state of mind of these passengers is not relevant.

THE COURT: Objection overruled.

State Farm's argument concerning Mr. Bailey's questioning of Mr. Kiev is two-fold. First, State Farm contends that the allegations made in the Kheiv passengers' lawsuit were

17

hearsay statements or improper character evidence and, thus, it was improper for Plaintiffs' lawyer to cross-examine Mr. Kheiv about what his passengers averred in their sworn complaint against Mr. Kheiv. Second, State Farm contends that the alleged error in the scope of cross-examination was exacerbated by the fact that Plaintiffs' lawyer highlighted the testimony in his closing argument. State Farm cites the following excerpt from the closing argument:

> Now, we have some additional evidence to compare these stories to. There were six people at this collision site that saw everything. There was Jake Pravongviengkham, Jessica Huyn, and Vuthy Srey, who were the three passengers in the Kheiv vehicle. That's three. There was Mr. Kheiv himself. That's four. Connie Taylor, five; Emil Sadowski, six; and Kate Sadowski, seven. There's actually seven people. So the three passengers all sued Chamroeun Kheiv and accused him of causing the collision.

State Farm contends that of these "seven witnesses," only two, i.e., Ms. Taylor and Mr. Kheiv, actually testified at the trial. As noted above, Ms. Taylor and Mr. Kheiv gave contradictory accounts of how the accident occurred. By not omitting the questioning and argument concerning the Kheiv passengers' complaint, State Farm contends that the trial court allowed Plaintiffs to "improperly argue to the jury that there was a weight of evidence against Mr. Kheiv which included the passengers in his own vehicle. . . ."

We note at the outset that State Farm did not make a contemporaneous objection during Plaintiffs' closing argument. The best practice would have been for State Farm to object promptly and to request a curative instruction from the trial court. *Morgan v. Duffy*, 30 S.W. 735, 736 (Tenn. 1895); *Lee v. Lee*, 719 S.W.2d 295, 299 (Tenn. Ct. App.1986). However, even if we allow, *arguendo*, that State Farm preserved its issue concerning the scope of the Plaintiffs' closing, it is well settled that in reviewing a trial court's decision with respect to arguments made by counsel, including those made in closing argument, this Court applies an abuse of discretion standard. *Perkins v. Sadler*, 826 S.W.2d 439, 442 (Tenn. Ct. App. 1991). Likewise, concerning the scope of cross-examination, we note that the admissibility of evidence also rests within the sound discretion of the trial court. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn.1992) Accordingly, we review the trial court's decision under an abuse of discretion standard. *State Dep't of Transp. v. Veglio*, 786 S.W.2d 944, 948 (Tenn. Ct. App.1989). The abuse of discretion standard requires us to consider "(1) whether the decision has a sufficient evidentiary foundation, (2) whether the trial court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." *State ex rel. Vaughn*

18

*v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). "While we will set aside a discretionary decision if it rests on an inadequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative." *Id*. If this Court finds error, we will only set aside the final judgment upon a finding that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

Turning back to Plaintiffs' cross-examination of Mr. Kheiv, generally, "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility. . . ." Tenn. R. Evid. 611. This rule "retains the English rule permitting wide-open scope of cross-examination historically favored in Tennessee." Tenn. R. Evid. 611 advisory commission comment (citing *Sands v. Southern Railway Co.*, 64 S.W. 478 (Tenn. 1901)). Accordingly, "[i]t is well established that wide latitude should be afforded on cross-examination." *Steele v. Ft. Sanders Anesthesia Group, P.C.*, 897 S.W.2d 270, 278 (Tenn. Ct. App. 1994). "Furthermore, a witness may be cross-examined to show possible prejudice or bias, and this right should be limited only upon a showing of the most extraordinary circumstances." *Id*. (citing *Phillips v. Pitts*, 602 S.W.2d 246, 249 (Tenn. Ct. App. 1980)).

As noted above, State Farm argues that the Kheiv passengers' statements were hearsay, or, alternatively, that the statements were offered as improper "character evidence," in violation of Tennessee Rule of Evidence 404, which provides, in relevant part, that "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion. . . ." As set out in full context above, Mr. Bailey defended his cross-examination of Mr. Kheiv, stating that the questions concerning Mr. Kheiv's passengers' complaint were "not being introduced for the truth of the matter asserted. This is being introduced to show that other people obviously had a different perception of this than he did." Mr. Kheiv's testimony contradicted Ms. Taylor's and Mr. Miller's. Accordingly, Plaintiffs should have been allowed to impeach Mr. Kheiv's credibility on cross examination. Furthermore, our review of the transcript of the trial indicates that State Farm's lawyer was, in fact, the first to bring the passengers' statements to the attention of the jury. During opening argument, State Farm's lawyer stated: "[Kheiv's] in the middle of those three eastbound lanes. That's what he will say, **that's what his three friends will say**. . . ." Later, when State Farm's lawyer was cross-examining Plaintiffs' expert, Mr. Miller, he brought up the Kheiv passengers' deposition testimonies, saying: "[I]f the accident had instead happened–not in the center, in the middle of those three eastbound lanes as the accident report shows and as the witnesses in the Kheiv vehicle say. . . ;" and "I want you to confirm for the jury that when you read the depositions of [the three Kheiv passengers] that's what they all said is this accident happened in the middle of those three center lanes." Respectfully, State Farm cannot have its proverbial cake and eat it too.

19

Because State Farm opened the door to the Kheiv passengers' observations, we cannot conclude that the trial court erred in declining to shut that same door on the Plaintiffs. Regardless, State Farm has not shown that the disputed line of questioning "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

## C. Mistrial

In its third issue, State Farm argues that Plaintiffs' lawyer offered an improper argument and injected the issue of insurance into the case by making the following statements during his closing argument:

> Another thing I'm concerned about is if anybody says, "Oh, well, Mr. Kheiv doesn't look to me like a very rich guy. He probably doesn't have any money. Maybe we should cut him some slack." Then I hope the rest of you will say, "Wait a minute. That's not a factor for us to consider. We are not supposed to guess whether he does or doesn't have money or where the money might come from or anything like that."

Following this statement, State Farm objected and the following transpired outside the hearing of the jury:

> MR. MOORE: I object and move for a mistrial. That was an obvious veiled reference to insurance for which there can be no excuse. I saw Your Honor's eyebrows go up just as mine did.
>
>     \*                \*             \*
>
> MR. BAILEY: That's ridiculous. I'm telling the jury they are not supposed to even think about that subject.
>
> MR. MOORE: By bringing it up?
>
> MR. BAILEY: It's a correct statement of the law.
>
> THE COURT: By saying don't be concerned about where it comes from?
>
> MR. BAILEY: That's right.

MR. MOORE: I ask for a mistrial.

THE COURT: Stay away from that altogether, Mr. Bailey. That could mean Mr. Moore or family members, but you are getting dangerously close, so leave that subject alone.

MR. BAILEY: All right.

THE COURT: Your motion is denied.

Generally speaking, the more modern cases recognize that before the "liability insurance" error will warrant reversal, there must be a showing that the injection of liability insurance into the case was an "error involving a substantial right [that] more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *Terry v. Plateau Electric Coop.*, 825 S.W.2d 418, 422-23 (Tenn. Ct. App.1991). Some of the earlier cases analyzed such an error in the context of the so-called "harmless error" statute, last codified at Tennessee Code Annotated Section 27-1-117.[6] *See e.g.*, *East Tennessee Natural Gas Co. et al. v. Peltz*, 270 S.W.2d 591, 609 (Tenn. Ct. App.1954).

In arguing that Plaintiffs' lawyer's statement that the jury should not be concerned with "where the money might come from" was improper because it was "a deliberate attempt to convey the fact of insurance to the jury," State Farm compares the statements at issue here to those made by a lawyer in the case of *Lovin v. Stanley*, 493 S.W.2d 725 (Tenn. Ct. App. 1973). In *Lovin*, this Court reversed the jury's verdict and remanded the case for new trial based, *inter alia*, upon the following statements made by counsel:

> You do not have to concern yourself one bit with the source of whatever you deem is reasonable and proper in this case. I normally wouldn't or couldn't say that and would be ashamed to, but now I have to. **She's in good hands**, gentlemen, is all I can say. I am ashamed to have to bring it to you in this way.

*Id*. at 726-27 (emphasis added). Although State Farm asserts that Mr. Bailey's statement is "virtually identical" to the one that required reversal of the jury's verdict in *Lovin*, we conclude that Mr. Bailey's statement, although (as the trial court correctly noted) perhaps burgeoned on inappropriate argument, did not rise to the level of the statements made in *Lovin*. In *Lovin*, the lawyer not only argued that the jury should not concern itself with "the

---

[6] Repealed by Chapter 449 of the Public Acts of 1981.

21

source" of payment on its verdict, but the lawyer also went so far as to make an overt reference to a popular Allstate slogan, i.e., "You're in Good Hands with Allstate." The *Lovin* Court reasoned that the statement "She's in good hands" was a direct reference to insurance and, as such, could lead "most jurors [to] equate counsel's statement to defendants' having insurance coverage" because the advertising slogan was universally known. *Id*. at 727. Because the gravamen of our holding in *Lovin* was the direct reference to the insurance company's advertising slogan, we cannot, as State Farm argues, stretch our holding in that case to cover those situations, such as the one at bar, where a lawyer tells the jury not to be concerned with the source of any payments. While such tactic may fall in the gray area of what is appropriate argument, in order to warrant a mistrial, there would have to be some evidence that Mr. Bailey's statements were willfully made for the purpose of improperly influencing the jury. *Id*.

State Farm also cites the case of *Woods v. Meachum*, 333 S.W.2d 567 (Tenn. Ct. App. 1960), where this Court remanded the case for a retrial. In *Woods*, the lawyer inappropriately asked the defendant: "If this jury should give a $10,000 verdict against you, not one penny of it would come out of your pocket, would it?" Although this statement does improperly suggest the existence of insurance, our holding in *Woods* was also based on the fact that the statement suggested the amount the jury should award. *Id*. at 577. Furthermore, in *Woods*, the lawyer repeated the statement **after** the trial court ruled that it was improper. *Id*. It was, therefore, the culmination of several errors that led us to order a new trial in *Woods*. In this regard, the instant case is distinguishable. Here, Mr. Bailey's statement does not specifically mention or overtly allude to insurance; he states that the jury should not worry about the source of payment. He does not, however, go so far as to indicate that the payment would come from insurance proceeds. Furthermore, after the trial court cautioned Mr. Bailey that he was proceeding dangerously close to the insurance topic, he immediately changed his course and did not attempt to continue the line of argument. In *Lasater Lumber Co. v. Harding*, 189 S.W.2d 583 (Tenn. Ct. App. 1944), this Court noted:

> The tendency of the courts is towards a more liberal rule in refusing reversals upon the ground that it appears from the evidence that the defendant carries indemnity insurance in such cases, especially where it appears that no improper practice has been resorted to inject the subject into the record. And this is as it should be, in view of the fact that the custom of automobile owners in carrying liability insurance against loss or damage has become so general that jurors must be assumed to be cognizant of the fact.

*Id*. at 588 (internal citations omitted). Likewise, in the case of *Stroud v. Seaton*, No.

22

03A01-9802-CV-00060, 1998 WL 641923 (Tenn. Ct. App. Sept. 18, 1998), this Court explained:

> It is error for a witness or an attorney to mention–in the presence of the jury–liability insurance during the trial of a motor vehicle, negligence case such as the one now before us. *Lovin v. Stanley*, 493 S.W.2d 725, 727-28 (Tenn. Ct. App.1973). *See also* Rule 411, Tenn. R. Evid. Our cases have emphasized that a party's **deliberate attempt to interject such evidence, especially if persistently pursued, is more apt to lead to reversal than is an inadvertent reference to insurance**. *See, e.g.*, *Potts v. Leigh*, 15 Tenn. App. 1, 5 (1931). In any event, it is clear from the cases that the issue of whether a reference to insurance is egregious enough to warrant a new trial is a matter that addresses itself to the sound discretion of the trial court, and that such discretion will be disturbed on appeal "only in exceptional cases." *Klein v. Elliott*, 59 Tenn. App. 1, 436 S.W.2d 867, 880 (Tenn. Ct. App.1968). *See also* *Prewitt-Spurr Mfg. Co. v. Woodall*, 90 S.W.2d 623, 624 (Tenn.1905).

*Id*. at *2 (emphasis added). Here, Mr. Bailey's statement is not sufficiently egregious and his pursuit of the insurance line of argument is not so overt as to rise to the level of the "exceptional cases" that warrant retrial. Although the trial court was correct to caution Mr. Bailey to immediately change the course of his argument, we cannot conclude that the denial of State Farm's motion for mistrial on this issue constitutes an abuse of discretion.

### D. Medical Records

During Dr. Mohan's testimony, Plaintiffs introduced excerpted medical records from the emergency room portion of Mr. Sadowski's hospital bill. One of the portions of the bill that was redacted was a handwritten notation concerning a statement that State Farm attributed to Mr. Sadowski, wherein he allegedly stated that "the reason he was there [i.e., in the emergency room] was failure to yield, hit by a car." State Farm's lawyer asked Dr. Mohan, on cross-examination:

Q. Now, when you saw Mr. Sadowski you were able to speak with him and he was able to speak with you?

A. That's right.

23

Q. You were also able to read what had been written in the records before you saw him?

A. Yes.

Q. Do you recollect reading out of the emergency room that he told them–

At this point, Plaintiff's lawyer objected and argued (outside the hearing of the jury) that the disputed notation on Mr. Sadowski's medical record was "double hearsay" in that "we don't know who said it. We don't know who it was said to." During further discussion at the bench, Plaintiffs' lawyer argued that "[the disputed notation] doesn't even say who failed to yield . . . [and] it would be unduly prejudicial to us to put this in here because it is not even clear who it is referring to." In addition, Plaintiffs' lawyer noted that "there is nothing about failure to yield, hit by a car that would in any way contribute to [Dr. Mohan's] treatment of Mr. Sadowski." At this point, the trial court allowed State Farm's lawyer to voir dire Dr. Mohan to establish that the disputed record was kept in the ordinary course of business and that the information contained therein was "recorded at the time [Mr. Sadowski] presented to the emergency room." Dr. Mohan also established that "the people who wrote down that information. . . were under a business duty to record the information truthfully and accurately." Thereafter, Plaintiffs' lawyer was given the opportunity to question Dr. Mohan. During that portion of the voir dire, Dr. Mohan stated that he did not rely on the statement "hit by a car, failure to yield," in treating Mr. Sadowski. Furthermore, Dr. Mohan could not definitively state who made the statement, or who wrote it down, although he assumed it was written by an emergency room nurse during Mr. Sadowski's triage.

In overruling State Farm's objection, the trial court stated, in relevant part:

I have looked at the rules again, the Rules of Evidence and the document itself. Based upon what I have read from the document and the rules, Mr. Moore, I am going to deny your right to introduce this document on the following basis. Number one, I have heard that there was no reliance on this document by [Dr.] Mohan. Two, it was not used as an exception. It could be established as a business record exception, but not as to the admission statement contained in the record. And in this Court's mind you have not demonstrated a second exception to the hearsay rule to allow this statement. It is not medical diagnosis of treatment. The Court did not view this as an admission by party opponent for admission against interest.

24

Further, I did not look at this and view this as some prior inconsistent statement as it was a statement not signed or recorded by a physician.

Regarding relevance, Tennessee Rule of Evidence 401 provides:

Rule 401. Definition of "relevant evidence."—"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Our Supreme Court recently explained:

Relevant evidence is admissible, and irrelevant evidence is not, unless excepted by the state and federal constitutions, the Tennessee Rules of Evidence, or other rules or laws generally applicable to the courts. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence ." Tenn. R. Evid. 401. The admission of evidence is left to "the sound discretion of the trial judge," *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn.1992), and "[r]elevancy is always a judicial question to be determined according to the issue which is to be tried." *Randolph v. State*, 570 S.W.2d 869, 872 (Tenn. Crim. App.1978) (quoting *Ellison v. State*, 549 S.W.2d 691, 696 (Tenn. Crim. App.1976)). We review a trial court's admission of evidence under an abuse of discretion standard and will reverse the decision to admit evidence only if "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn.2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn.1999)) (internal quotation marks omitted).

*In re Estate of Smallman*, 398 S.W.3d 134, 149 (Tenn. 2013). Evidence that is relevant can still be deemed inadmissible, however, if its probative value was substantially outweighed

25

by the danger of unfair prejudice. *See **Herbert by Herbert v. Brazeale***, 902 S.W.2d 933, 938 (Tenn. Ct. App.1995); Tenn. R. Evid. 403. Tennessee Rule of Evidence 403 provides:

> Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.—Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

As noted above, Plaintiffs' objection to the notation "failure to yield, hit by a car," was made on grounds that the statement was inadmissible hearsay contained within a hearsay document. Specifically, Plaintiffs argue that "[b]ecause the . . . statement . . . is a statement made by some unknown person that was then recorded by a different unknown person who was treating Mr. Sadowski in the emergency room, this statement is double hearsay." Tennessee Rule of Evidence 805 addresses hearsay within hearsay and provides: "Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules or otherwise by law."

In the first instance, medical records are not admissible unless they meet an enumerated exception under Tennessee Rule of Evidence 803. Tenn. R. Evid. 802; ***State v. Goldston***, 29 S.W.3d 537, 540-41 (Tenn. Crim. App. 1999) (verifying that a hearsay exception was met before agreeing that medical records were properly admitted by the trial court). Here, State Farm makes three arguments. First, State Farm argues that because Plaintiffs were permitted to introduce excerpted portions of the medical records "from that very same emergency room presentation," it should be allowed to introduce the portion of the record containing the failure to yield statement. We have reviewed the portion of the trial transcript where Plaintiffs were allowed to introduce certain portions of Mr. Sadowski's emergency room medical records, and there is no indication that State Farm lodged any objection to the Plaintiffs' proffer of this evidence. Consequently, any issues regarding the portion of the medical records that were allowed into evidence are waived. ***Wright v. United Servs. Auto. Ass'n***, 789 S.W.2d 911, 914 (Tenn. Ct. App.1990). Simply because certain portions of a hearsay document are allowed into evidence does not, *ipso facto*, mean that the entire document will qualify for admission under the Tennessee Rules of Evidence, *see* discussion *supra*.

State Farm next contends that the disputed portion of Mr. Sadowski's record should come into evidence as an exception to the hearsay rule under Tennessee Rule of Evidence 803(4). The Rule provides:

**Statements for Purposes of Medical Diagnosis and**

26

**Treatment**. Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

The rationale for this exception to the hearsay rule is that persons who are seeking medical diagnosis and treatment will make reliable statements to assure proper medical care. ***State v. Livingston***, 907 S.W.2d 392, 396 (Tenn. 1995).

As set out in full context above, Dr. Mohan established that he did not rely on the statement "failure to yield, hit by a car" in diagnosing or treating Mr. Sadowski. Specifically, Dr. Mohan testified: "I don't care what they say. For treating this is not an important part of information that this accident happened because of failure to yield or red light or green light." Furthermore, there was no evidence that any other physician, nurse, or medical employee relied on this statement in treating Mr. Sadowski. In this regard, the instant case is similar to ***State v. Lynn***, 924 S.W.2d 892 (Tenn. 1996). In ***Lynn***, our Supreme Court noted that a statement in a medical record that the patient had been hit with a baseball bat was hearsay by itself and could be admitted only if a hearsay exception existed. *Id*. at 898. In ***Lynn***, the proponent of the evidence argued that the statement that the patient had been hit by a baseball bat was admissible under Tennessee Rule of Evidence 803(4) as the statement was arguably made for purposes of medical diagnosis and treatment. The Supreme Court noted:

> The statements are admissible, however, only if they are reasonably pertinent to both diagnosis and treatment. In this instance, the state's expert witness, a neurosurgeon, testified that, for purposes of treatment, it made no difference whether the victim was hit with a baseball bat or a pool cue. This opinion contradicted that contained in the paramedic report which was admitted over objection. Upon retrial, the trial judge should carefully consider whether the statement in the paramedic's report satisfies the 803(4) requirements.

*Id*. at 898 (internal citation omitted). Dr. Mahon's testimony that he did not rely on the disputed statement in either his diagnosis or treatment of Mr. Sadowski, coupled with the lack of any evidence that other medical personnel relied on the statement, precludes the operation of Tennessee Rule of Evidence 803(4) in this case.

Alternatively, State Farm argues that the medical record should come into evidence under the exception outlined at Tennessee Rule of Evidence 803(6), which provides:

27

**Records of Regularly Conducted Activity**. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

As noted above, Dr. Mahon testified that the disputed emergency room record was "recorded at the time [Mr. Sadowski] presented to the emergency room." Dr. Mohan also established that "the people who wrote down that information. . . were under a business duty to record the information truthfully and accurately." This testimony may establish the medical record itself as a business record that would qualify for admission under Rule 803(6). However, recall that not only the record itself, but also the disputed statement "failure to yield, hit by a car" must fall within a hearsay exception in order to come into evidence over Plaintiffs' objection. Dr. Mahon testified that he did not make the notation on the medical record; he further explained that he did not know who made the notation. In short, the source of the notation was never established.

In addition, we note that the statement "failure to yield, hit by a car," does not answer the question of who failed to yield. Accordingly, its probative value is suspect. For this reason, and for those enumerated above, we conclude that the disputed statement could confuse, mislead, or prejudice the jury in violation of Tennessee Rule of Evidence 403, *supra*. ***Conley v. Life Care Centers of America, Inc.***, 236 S.W.3d 713, 740-41 (Tenn. Ct. App. 2007) (affirming the trial court's exclusion of statements in a hospital record regarding patient's combative behavior where the source of that information was not known because it was unreliable hearsay and more prejudicial than probative under Tennessee Rule of Evidence 403). Therefore, we cannot conclude that the trial court abused its discretion in declining to allow the portion of the medical records containing the statement "failure to yield, hit by a car."

## E. Lawyer Misconduct

State Farm further submits that it is entitled to a new trial because the jury was guided by "bias, passion, and prejudice." Specifically, State Farm asserts that Plaintiffs' lawyer was guilty of acts of wrongdoing including: (1) displaying photographs of Mrs. Sadowski in her hospital bed without offering the photographs into evidence; (2) displaying selected medical records with key words highlighted without offering the records into evidence; and (3) telling the jury that it should "send through your verdict a message" during his closing argument. It is well settled that "[m]isconduct by an attorney that results in prejudice may serve as a basis for new trial. The burden of showing prejudice rests with the party seeking the new trial, and [trial courts] have broad discretion in deciding whether to grant a motion for new trial." *Maday v. Public Libraries of Saginaw*, 480 F.3d 815, 819 (6th Cir. 2007) (citations omitted). To be entitled to a new trial on the basis that the trial was unfair, the moving party must show that the jury was influenced by prejudice or bias. *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045 (6th Cir.1996). This Court must "determine 'whether there is a reasonable probability that the verdict of the jury has been influenced by improper conduct.'" *Maday*, 480 F.3d at 819 (citations omitted). The reviewing court must consider the totality of the circumstances, considering the number of comments, the nature of the comments, possible relevance to the issues, and the manner in which the parties and the court treated the comments. *Id*.

### 1. Photos of Kathryn Sadowski

Important to this issue is the fact that Brooks and David Monypeny, as Co-Executors of Mrs. Sadowski's estate, were represented by R. Sadler Bailey at trial. Mr. Sadowski was represented by Donald Capparella. During his opening argument, Mr. Bailey allegedly displayed photographs of Mrs. Sadowski *in extremis*, lying in her hospital bed. State Farm's lawyer lodged a timely objection to these photos, arguing that they had not been produced during discovery and that the photos were outside the court's pre-trial instruction limiting the photographic evidence that could be presented to the jury. Although Mr. Bailey initially insisted that he had produced the photos in response to State Farm's requests for discovery, he later clarified that his office never received a request from State Farm concerning the disputed photographs. It was later discovered that State Farm had propounded this discovery request only on Mr. Caparella and not on Mr. Bailey. Accordingly, we cannot conclude that the trial court erred in denying State Farm's motion for mistrial on grounds of displaying the photographs.

Furthermore, we note that the offending photographs are not contained in our appellate record, as no offer of proof was made following the objection. The Tennessee Rules of Appellate Procedure require the appellant to prepare the record on appeal so that it

conveys a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b). Furthermore, "it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not [inclusion or exclusion of evidence] was reversible." *Harwell v. Walton*, 820 S.W.2d 116, 118 (Tenn. Ct. App. 1991) (citing *State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986)). We will not reverse a trial court's evidentiary ruling if the appellant fails to make an offer of proof regarding the substance of the evidence. *Dickey v. McCord*, 63 S.W.3d 714 (Tenn. Ct. App. 2001); *Anderson v. American Limestone, Co.*, 168 S.W.3d 757 (Tenn. Ct. App. 2005). Therefore, in the absence of these photographs, this Court cannot review them so as to make an independent assessment of their potential impact on the jury. Accordingly, we defer to the trial court's decision on this issue.

### 2. Kathryn Sadowski's Medical Records

State Farm also contends that it is entitled to a new trial on the grounds that Mr. Bailey displayed highlighted portions of Mrs. Sadowski's medical records in an attempt to appeal to the jury's emotions. Again, we note that the offending portions of Mrs. Sadowski's medical records were not made part of our record on appeal so as to allow us any meaningful review. However, more problematic is the fact that State Farm failed to lodge a timely objection to the highlighted records. Any issues relating to the admission of the highlighted records are waived because State Farm did not object when the documents were shown to the jury. Tenn. R. App. P. 36(a) (providing that failure to contemporaneously object to the admission of inadmissible evidence results in waiver of the issue on appeal).

### 3. Closing Argument Comments

During closing argument, Mr. Bailey made the following statements:

> Juries are called sometimes the conscience of the community. You set the standard for what is safe, what we will tolerate here in Shelby County, Tennessee, whether or not it's okay in Shelby County, Tennessee, to drive like Mr. Kheiv did, because if we say that's okay, then everybody is in danger, everybody.
>
> I would hope and I ask this jury to send through your verdict a message that we don't tolerate that kind of driving. We are not going to stand for it, and if you're going to do that, you are going to be held accountable.

State Farm contends that the instruction to "send through your verdict a message" constitutes

30

reversible error and requires remand for re-trial. We reiterate that, "[i]n general, the control over the argument of counsel resides with the trial court, and the trial court has broad discretion as to what shall and shall not be permitted in argument." **Davis v. Hall**, 920 S.W.2d 213, 217 (Tenn. Ct. App.1995). In reviewing a trial court's action in **Davis**, this Court stated that it:

> generally will not interfere with the discretionary action of a trial court in refusing to grant a mistrial or a new trial for misconduct of counsel in argument unless the argument is clearly unwarranted and made purely for the purpose of appealing to passion, prejudices and sentiment which cannot be removed by sustaining the objection of opposing counsel.

*Id.* (citing **Perkins v. Sadler**, 826 S.W.2d 439, 442 (Tenn. Ct. App.1991)).

We note that State Farm did not lodge a contemporaneous objection to this statement, but waited until Mr. Bailey, immediately after the foregoing comments, made an alleged reference to insurance coverage, *see* discussion *supra*. In this regard, the instant case is similar to **Smartt v. NHC Healthcare/McMinnville, LLC**, *et al.*, No. M2007-02026-COA-R3-CV, 2009 WL 482475 (Tenn. Ct. App. Feb. 24, 2009), on which State Farm relies in its brief. In **Smartt**, this Court held that the trial court did not err in finding that the "argument was within the law provided in the jury instructions and defense counsel made no objection at the time the argument was made." *Id*. at *19. Likewise, in the instant case, the trial court properly instructed the jury that "any question, objection, statement, or arguments made by the lawyers during the trial are not evidence in the case." Furthermore, the trial court cautioned the jury "not [to] be influenced by sympathy, prejudice, or passion." In light of these instructions, and because there was no specific contemporaneous objection, we cannot conclude that the trial court abused its discretion in declining to grant State Farm's motion for new trial on this ground.

### F. Jury Instructions

In its sixth issue, State Farm asserts that the trial court erred in instructing the jury on the statute governing the appropriate conditions for passing on the right. The statute, Tennessee Code Annotated Section 55-8-118 provides:

### § 55-8-118. Overtaking and passing on right

> (a) The driver of a vehicle may overtake and pass
> upon the right of another vehicle only under the

31

following conditions:

(1) When the vehicle overtaken is making or about to make a left turn;

(2) Upon a street or highway with unobstructed pavement not occupied by parked vehicles of sufficient width for two (2) or more lines of moving vehicles in each direction; and

(3) Upon a one-way street, or upon any roadway on which traffic is restricted to one (1) direction of movement, where the roadway is free from obstructions and of sufficient width for two (2) or more lines of moving vehicles.

(b) The driver of a vehicle may overtake and pass another vehicle upon the right only under conditions permitting that movement in safety. In no event shall the movement be made by driving off the pavement or main-traveled portion of the roadway.

It is the trial court's duty to instruct the jury on "every factual issue and theory of the case presented by the parties." *Ricketts v. Robinson*, 169 S.W.3d 642, 646 (Tenn. Ct. App. 2004) (citing *Cole v. Woods*, 548 S.W.2d 640, 642 (Tenn.1977)). This Court reviews the jury charge in its entirety to determine whether the trial judge committed reversible error. Jury instructions are not measured against the standard of perfection. The charge will not be invalidated if it "fairly defines the legal issues involved in the case and does not mislead the jury." *Id*. Furthermore, a particular instruction must be considered in the context of the entire charge. *Id.* (citing *City of Johnson City v. Outdoor West, Inc.*, 947 S.W.2d 855, 858 (Tenn. Ct. App.1996)). Whether a jury instruction is erroneous is a question of law and is, therefore, subject to *de novo* review with no presumption of correctness. *Solomon v. First Am. National Bank of Nashville*, 774 S.W.2d 935, 940 (Tenn. Ct. App.1989). The legitimacy of a jury's verdict is dependent on the accuracy of the trial court's instructions, which are the sole source of the legal principles required for the jury's deliberations. Therefore, a trial court is under a duty to impart "substantially accurate instructions concerning the law applicable to the matters at issue." *Hensley v. CSX Transp., Inc.*, 310 S.W.3d 824, 833 (Tenn. Ct. App. 2009) (quoting *Bara v. Clarksville Mem'l Health Sys., Inc.*, 104 S.W.3d 1, 3-4 (Tenn. Ct. App. 2002)). When considering whether a trial court committed prejudicial error in a jury

instruction, it is our duty to review the charge in its entirety and to consider it as a whole. The instruction will not be invalidated if it "fairly defines the legal issues involved in the case and does not mislead the jury." ***Otis v. Cambridge Mut. Fire Ins. Co.***, 850 S.W.2d 439, 446 (Tenn.1992). The judgment of a trial court will not be set aside based on an erroneous jury instruction unless it appears that the erroneous instruction more probably than not affected the judgment of the jury. Tenn. R. App. P. 36(b); ***Gorman v. Earhart***, 876 S.W.2d 832, 836 (Tenn.1994).

State Farm argues that the jury instruction based on Tennessee Code Annotated Section 55-8-118 has "no applicability in the case before the court." Despite State Farm's argument, the testimony at trial indicated that the car driven by Mr. Kheiv passed Connie Taylor's vehicle on the right at a high rate of speed before colliding with the Sadowskis' vehicle. Because Ms. Taylor's version of events encapsulated Plaintiffs' theory of the case, Plaintiffs suggested that the trial court only instruct the jury concerning subsection (b) of the statute, i.e., "[t]he driver of a vehicle may overtake and pass another vehicle upon the right only under conditions permitting that movement in safety." When asked whether he agreed with the use of the truncated statute, State Farm's lawyer stated: "I have no objection to the plaintiff's proposed instruction other than. . . [i]t is an incomplete excerpted statement of the law." From our reading of the jury charge conference, it appears that State Farm expressed no general disagreement with the Tennessee Code Annotated Section 55-8-118 instruction except that the entire statute was not proposed by the Plaintiffs. In light of State Farm's objection, the trial court agreed to instruct the jury with the entire statute. The trial court then asked whether the following instruction was acceptable: "Number 10 I'm going to put at the bottom, as I indicated, overtaking and passing on the right-hand side and I'm going to read the entire statute, 55-8-118." State Farm's lawyer responded "No objection." As noted above, "a party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal." Tenn. R. App. P. 36(a). However, even if we assume, *arguendo*, that State Farm has preserved this issue for appeal, we nonetheless conclude that the trial court properly instructed the jury on Tennessee Code Annotated Section 55-8-118 because part of Plaintiffs' theory of the case was that Mr. Kheiv passed Ms. Taylor's vehicle in the right lane of Highway 64 and in an unsafe manner.

### H. Ave Maria Medical Expenses

In its next issue, State Farm asserts that the expenses Mr. Sadowski incurred for the services provided by the Ave Maria assisted living center were not properly before the jury because Plaintiffs failed to establish: (1) that the charges are "causally related to the automobile accident;" and (2) that the expenses are "consistent with the customary and prevailing charges in the community for the same or similar services." It is well settled that in personal injury lawsuits, the plaintiff "bears the burden of proving that medical expenses

the plaintiff is seeking to recover are necessary and reasonable." ***Borner v. Autry***, 284 S.W.3d 216, 218 (Tenn. 2009).

Turning to the record, as briefly discussed above, the evidence indicates that, prior to the accident, Mr. Sadowski was living independently. However, Mr. Sadowski's treating physician, Dr. Sunita Jain, testified that after Mr. Sadowski left the Baptist Rehabilitation Center, he needed supervision:

> Q [to Dr. Jain]: You indicated in your note that Mr. Sadowski would be going to an assisted living facility?
>
> A. Yes.
>
> Q. And you referred to that earlier as Ave Maria?
>
> A. Yes, that's the name of the assisted living facility.
>
> Q. Did you have an opinion as to whether it was necessary for Mr. Sadowski to be discharged to an assisted living facility?
>
> A. Well, as was indicated in the notes, we . . . reviewed [Mr. Sadowski's] status both from a functional point of view and from a disposition point of view . . . and it was determined that Mr. Sadowski still required supervision at the time of the discharge, which meant either somebody would have to be with him available at home or he needed to be in a place where another person would be available to provide that supervision.
>
> *                    *                    *
>
> Q. Why was it that he could no longer go home?
>
> A. Looking at his functional status he still required supervision for all of those tasks and in order for him to be home by himself he would have needed to be at least modified independent level, which he was not.
>
> *                    *                    *
>
> Q. What is your opinion about whether his need for this around-

34

the-clock supervision was related to the car collision?

A. Again, based on our history, he was reported to be independent prior to the trauma and given the injuries and the pain and the range of motion that we saw in the hospital as well as the safety issues, that's what determined the need for supervision.

Q. When you say prior to the trauma do you mean prior to the car collision that was reported?

A. Yes.

Q. Is this an opinion that you hold to a reasonable degree of medical certainty?

A. Yes.

We glean from State Farm's argument that it is of the opinion that because of Mr. Sadowski's advanced age and pre-existing conditions at the time of the accident, the requirement for assisted living was not causally related to the accident. We note the well-established principle that "a defendant takes a plaintiff as he finds him. The fact that a party is in a weakened condition at the time of the injury is not a causal defense available to the defendant." *Fuller v. Speight*, 571 S.W.2d 840, 841 (Tenn. Ct. App. 1978). Regardless, from Dr. Jain's testimony, a reasonable jury could conclude that the Ave Maria expenses were medically necessary and arose as a direct result of the accident.

Beyond his initial need for assisted living, the record indicates that Mr. Sadowski continued to need assistance for the two years he remained in assisted living. Ave Maria Wellness Director Caralena Lawrence, who is a licensed social worker, has worked at the Ave Maria facility for more than five years and oversees the day-to-day operations. Ms. Lawrence testified that after arriving at Ave Maria, Mr. Sadowski did not improve. Rather, he continued to need assistance with maintaining his living space, meal preparation, administering his medication, and his personal hygiene. Ms. Lawrence further testified that Mr. Sadowski's cognition continued to decline after he came to the facility. She noted that he continued to have difficulty with his "orientation," especially concerning dates and time, and that his short-term memory was affected. The record also indicates that, following the accident and in light of the loss of his wife, Mr. Sadowski suffered from depression, which further impaired his ability to care for himself.

Relying on ***Garner v. Maxwell***, 360 S.W.2d 64 (Tenn. Ct. App. 1962), State Farm also contends that "[i]n order for medical expenses to be introduced into evidence, there must be testimony from a competent witness that the expenses are reasonable and necessary when compared to other facilities that offer similar services in the community." ***Id***. at 68. The relevant holding in ***Garner*** is as follows:

> Defendants' Assignment of Error VI complains of the ruling of the trial judge in allowing witness John W. Headrick, Office Manager of the Jackson-Madison County Hospital, to testify as to hospital and physical therapy bills incurred by plaintiff, without a showing that such medical expenses were necessary, and that charges therefor reasonable.
>
> The witness, Headrick, testified as to the reasonableness of the charges made by the hospital as compared to charges made by other hospitals in the general area. Also, Dr. Dodson testified that he treated plaintiff at the Jackson-Madison County General Hospital and 'put him on physiotherapy to limber up his knee', and Dowling testified, specifically, that the amount of his bill, $200.00, was reasonable. We think the testimony objected to was competent. At most, even if the testimony objected to were considered as having been improperly admitted, it would not justify a reversal of the cause, but only a remittitur.

***Id***. at 167. Contrary to State Farm's contention, ***Garner*** does not stand for the proposition that proof of medical expenses may only be admitted in a personal injury or wrongful death case when accompanied by proof that the charges are reasonable and necessary when compared to other similar facilities in the community. In ***Garner***, we held that testimony from a hospital office manager that certain charges made by the hospital were reasonable as compared to charges made by other hospitals in the area was competent evidence and properly admitted. ***Id***. at 168-69. In addition, we held that testimony from the plaintiff's treating physician that his own bill "was reasonable" was also competent and properly admitted evidence to show the reasonableness of plaintiff's medical expenses. ***Id***. In short, ***Garner*** stands for the proposition that "in a personal injury action the reasonableness of a charge for medical or hospital services can be shown by testimony of a member of the nonmedical staff of the hospital in which the injured party was treated." ***Id***.; *see also* L.C. DiStasi, Jr., Annotation, Necessity and Sufficiency, in Personal Injury or Death Action, of Evidence as to Reasonableness of Amount Charged or Paid for Accrued Medical, Nursing, or Hospital Expenses. 12 A.L.R. 1347 (2011).

Here, Ms. Lawrence testified, in relevant part, that Mr. Sadowski's medical charges for his care at Ave Maria were reasonable:

> Q. Ms. Lawrence, you are familiar with the charges for Ave Maria, is that correct?
>
> A. Yes, I am . . . . I determine the level of care the person will [receive] and let the business office know . . . so she will know what to charge them.
>
> Q. Are the charges of Ave Maria for [Mr. Sadowski] living there, are they reasonable?
>
> A. Yes.

Under the holding in **Garner**, Ms. Lawrence was qualified to give testimony regarding the reasonableness of Mr. Sadowski's medical expenses. Furthermore, we note that State Farm did not make a contemporaneous objection to the foregoing portion of Ms. Lawrence's testimony so as to dispute the foundation of her testimony. For these reasons, we cannot conclude that the trial court erred in denying re-trial on this issue.

## I.  Excessive Jury Award

In its next issue, State Farm argues that the jury's award *vis* Mr. Sadowski is so excessive and beyond the range of reasonableness that the trial court should have granted State Farm remittitur of the entire award pursuant to Tennessee Code Annotated Section 20-10-102, which provides in pertinent part as follows:

> (a) In all jury trials had in civil actions, after the verdict has been rendered and on motion for a new trial, when the trial judge is of the opinion that the verdict in favor of a party should be reduced and a remittitur is suggested by the trial judge on that account, with the proviso that in case the party in whose favor the verdict has been rendered refuses to make the remittitur, a new trial will be awarded, the party in whose favor such verdict has been rendered may make such remittitur under protest, and appeal from the action of the trial judge to the court of appeals.

37

In denying this issue in its ruling on State Farm's motion for new trial, the trial court, acting as thirteenth juror, approved the jury's verdict and specifically found that the damages assessed were within the range of reasonableness. Where the trial court approves the verdict as thirteenth juror, the appellate courts maintain the statutory authority to suggest or require a remittitur on appeal. *See* Tenn. Code Ann. § 20-10-103(a). Specifically,

> if after the case was tried in the lower court with a jury and no remittitur was suggested by the trial judge, a remittitur **is first suggested or required in the [C]ourt of [A]ppeals**, on penalty of granting a new trial, then ... the party in whose favor the verdict or judgment has been rendered may make the remittitur under protest in the [C]ourt of [A]ppeals, and take the case, by application for permission to appeal, for review upon that point, to the [S]upreme [C]ourt.

*Id*. (emphasis added); *see Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 129 (Tenn. 1980); *Murphy Truck Lines v. Brown*, 313 S.W.2d 440, 443 (Tenn. 1958).

Where the trial judge has approved the verdict in its role as thirteenth juror—as the trial court did in this case—this Court's review of the verdict and its ability to suggest a remittitur is limited to a review of the record to determine whether the verdict is supported by material evidence. *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn.1980); *see also Thrailkill v. Patterson*, 879 S.W.2d 836, 841 (Tenn.1994); *Ellis*, 603 S.W.2d at 129. Material evidence is "evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Knoxville Traction Co. v. Brown*, 89 S.W. 319, 321 (Tenn. 1905). An appellate court is required to take "the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and to discard all countervailing evidence." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 501-502 (Tenn. 2012) (quoting *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 833 (Tenn. 2010)). The material evidence analysis is very deferential to the award by the jury and the judgment of the trial court when it affirms the verdict as the thirteenth juror. *See Ellis*, 603 S.W.2d at 129 ("[W]hen the trial judge has approved the verdict, the review in the Court of Appeals is subject to the rule that if there is any material evidence to support the award, it should not be disturbed."). "It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review." *Hohenberg Bros. Co. v. Mo. Pac. R.R. Co.*, 586 S.W.2d 117, 119-20 (Tenn. Ct. App. 1979). "It is simply a search of the record to ascertain if material evidence is present to support the verdict." *Id.* Because the material evidence standard lies at the foundation of the right to trial by jury, if there is material

evidence to support a jury verdict, the appellate courts must affirm it. *See* Tenn. Const. art. I, § 6; ***Truan v. Smith***, 578 S.W.2d 73, 74 (Tenn.1979) (quoting ***D.M. Rose & Co. v. Snyder***, 206 S.W.2d 897, 901 (Tenn. 1947)); *see also* ***Grandstaff v. Hawks***, 36 S.W.3d 482, 497 (Tenn. Ct. App. 2000) ("We have a duty to uphold a jury's verdict whenever possible."). In ***Meals ex rel. Meals v. Ford Motor Co.***, 417 S.W.3d 414 (Tenn. 2013), our Supreme Court reiterated the role of the jury in assessing damages. Specifically, the Court held that the plaintiff (here, Mr. Sadowski) has the burden of "proving damages to such a degree that, while perhaps not mathematically precise, will allow the jury to make a reasoned assessment of the plaintiff's injury and loss." ***Id.*** at 419. Then, "[w]e entrust the responsibility of resolving questions of disputed fact, including the assessment of damages, to the jury." ***Id***.

Turning to the record, as set out above, the jury awarded Mr. Sadowski the following damages:

| | |
|---|---|
| Physical Pain and Suffering–Past | $150,000 |
| Physical Pain and Suffering–Future | $ 50,000 |
| Emotional Pain and Suffering–Past | $150,000 |
| Emotional Pain and Suffering–Future | $250,000 |
| Loss of ability to enjoy life–Past | $150,000 |
| Loss of ability to enjoy life–Future | $200,000 |
| Medical Expenses–Past | $125,746 |
| Medical Expenses–Future | $200,000 |
| Loss of consortium–past (period Kathryn Sadowski survived after collision) | $ 50,000 |
| Loss of services of his wife, Katryn Sadowski–past (period she survived after collision) | $ 50,000 |
| * * * | |
| Loss of Emil Sadowski of the love, society and companionship of his Wife, Kathryn Sadowski | $375,000 |

From the record, Mr. Sadowski spent several weeks in Baptist Hospital and in its rehabilitation facility. He incurred over $58,000 in medical bills. State Farm asserts that Mr. Sadowski had no overt injuries from the accident, i.e., no broken bones and no internal injuries. State Farm further asserts that, during his hospital stay, Mr. Sadowski "was consistently noted to be resting comfortably . . . without any complaint other than an

overwhelming desire to 'go home'." The proof at trial does not fully support State Farm's contention on this point. Mr. Sadowski's daughter, Terri McCord, testified about having to leave Mr. Sadowski's hospital room when the nurses would move him because she could not listen to her father cry out in pain:

> [Mr. Sadowski] was in the hospital for about nine days. The first two or three days he was in absolute horrific pain. His back was hurting him real bad. Whenever he moved or if they tried to move him like if they would come in and want to turn him or move him and I would go out in the hallway and just wait and let them do their thing and I would hear him just yelling like, stop, stop, put me back.
>
> His back was really in a lot of pain. He was on pain medication and it made him not clear headed. . . .

Likewise, Dr. Mohan testified that Mr. Sadowski "was in a lot of pain so we put him on Morphine. IV Morphine he was getting as needed, every four hours as needed and also at that same time we put him on Hydrocodone." Dr. Mohan explained that, "[a]lthough he did not break his bones . . . [Mr. Sadowski] had a pretty rough impact on his chest," which exacerbated his previous sternal injury.

We have previously discussed the fact that, after he was discharged from the rehabilitation center, his doctors required him to go to Ave Maria. According to Ms. Lawrence's testimony, by the time of trial, Mr. Sadowski had incurred an additional $74,000 in medical expenses at the assisted living facility. All evidence suggests that, prior to the accident, Mr. Sadowski was independent and very able to care for himself. By the time of trial, Mr. Sadowski had lost his wife of thirty years; had lost his ability to drive, which was a favorite past time; and had lost his independence. From the time he came to live at Ave Maria, the testimony indicates that Mr. Sadowski's physical and mental condition continued to decline, and he suffered from depression over the loss of Mrs. Sadowski and his independent life. He also suffered from chronic back pain. The foregoing proof was largely unrefuted in the record. At any rate, State Farm did not present countervailing evidence to dispute either the losses Mr. Sadowski suffered or the costs of his care. From the totality of the circumstances, we conclude that there was ample material evidence on which the jury could base its award of both non-economic and economic damages to Mr. Sadowski.

Concerning the damages for loss of consortium, it is well settled that damages awarded for loss of enjoyment of life are intended to compensate a plaintiff for the impairment of the ability to enjoy the normal pleasures of living. *Lang v. Nissan N. Am., Inc.*, 170 S.W.3d 564, 571-72 (Tenn. 2005). Here, the trial court, without objection from

State Farm, instructed the jury as follows:

> Loss of enjoyment of life takes into account the loss of the normal enjoyments and pleasures of life in the future, as well as limitations on the person's lifestyle resulting from the injury.

"The determination of such non-pecuniary . . . damages involves a subjective element not present in the determinations of ordinary facts. The jury trial guarantee requires that the subjective element involved be that of the community and not of judges." *Smartt*, 2009 WL 482475 at *21 (citing *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178 (Tenn. Ct. App. 2008)). Based upon the foregoing evidence concerning the effect of the accident on Mr. Sadowski's quality of life, there is ample evidence to justify the jury's verdict for loss of enjoyment of life and loss of consortium with Mrs. Sadowski.

## J. Application of Comparative Fault to Total Damages

In its order on the jury's verdict, the trial court reduced the total damages awarded to Mr. Sadowski as follows:

> After reducing the [total] amount [of damages awarded] by the 15% of fault allocated to Emil Sadowski, the judgment to Emil Sadowski is reduced from $1,050,000 in non-economic damages and $325,746 in economic damages to $892,500 in non-economic damages and $276,884.10 in economic damages. The $750,000 cap on non-economic damages in personal injury cases contained in Tenn. Code Ann. Sec. 29-39-102 further reduces the damages to Emil Sadowski as follows: non-economic damages of $892,500 is reduced to $750,000. Adding the economic damages after 15% fault reduction of $274,884.10 to the remaining non-economic damages leaves a final judgment to Emil Sadowski of $1,026,884.10 ($750,000 + 276,884.10). [Mr. Sadowski was also awarded loss of consortium damages in addition to the $1,026,884.10].

The damages awarded to the other Plaintiffs were similarly reduced by the court upon the application of comparative fault and the statutory cap on non-economic damages. On appeal, State Farm argues that the trial court's computation of the amount awarded to the Plaintiffs was erroneous. Specifically, instead of reducing the total amount of the jury award first by the 15% of fault assigned to Mr. Sadowski, and then applying the statutory cap to the reduced amount, State Farm argues that the trial court should have first applied the statutory cap and

41

then reduced the capped amount by the 15% for Mr. Sadowski's fault.

Although the statute governing the award of damages in civil actions, i.e., Tennessee Code Annotated Section 29-39-102, does not specifically address the question of whether comparative fault reductions should precede the application of the statutory cap, the statute does state that "[t]he limitation on the amount of noneconomic damages . . . shall not be disclosed to the jury, but shall be applied by the court to any award of noneconomic damages." Tenn. Code Ann. §29-39-102(g). In other words, the jury should make its award as if the statutory cap does not exist, and the jury's award should be based only on its determination of the allocation of fault in the case and its determination of the type and amount of damages. As noted above, "[w]e entrust the responsibility of resolving questions of disputed fact, including the assessment of damages, to the jury." *Meals*, 417 S.W.3d at 419. To apply the statutory cap before reducing the award by the percentage of fault–as State Farm proposes– would undermine the autonomy of the jury and its role in the trial.

In arguing its position, State Farm relies on subsection (b) of Tennessee Code Annotated Section 29-39-102, which provides:

> If multiple defendants are found liable under the principle of comparative fault, the amount of all noneconomic damages, not to exceed seven hundred fifty thousand dollars ($750,000) for each injured plaintiff, shall be apportioned among the defendants based upon the percentage of fault for each defendant, so long as the plaintiff's comparative fault (or in a wrongful death action, the fault of the decedent) is not equal to or greater than fifty percent (50%), in which case recovery for any damages is barred.

The foregoing statute is applicable to those situations where liability has been assigned to multiple tortfeasors. This is not the situation presented in the instant appeal. As correctly noted by Plaintiffs in their brief:

> [P]aragraph [(b)] of the statute . . . does not apply to the issue presented by State Farm because an allocation of fault among multiple defendants does not reduce the overall award like the allocation of fault to a plaintiff. Indeed, in some cases, a fault allocation to a plaintiff can reduce the damages to an amount below the $750,000 cap, making the cap inapplicable and unnecessary.

Although the statute addressing multiple defendants is not applicable in this case, and

42

there are no Tennessee cases that directly address the question of whether a jury's award on non-economic damages in a personal injury case should be reduced to the statutory cap before the application of comparative fault, we find the holding in **Lindgren v. City of Johnson City**, 88 S.W.3d 581 (Tenn. Ct. App. 2002), involving another statutory cap, to be instructive. By way of comparison, in **Lindgren**, which addressed the question of the application of the statutory cap set out in the Governmental Tort Liability Act, Tennessee Code Annotated Section 29-20-101 *et seq.*, this Court held:

> The trier of fact in a comparative fault case, such as this, should first determine the total amount of the plaintiff's damages without regard to fault, and then apportion damages on the percentage of fault attributable to each tortfeasor. **Grandstaff v. Hawks**, 36 S.W.3d 482 (Tenn. Ct. App.2000). In this case, the Trial Court did not follow this procedure, although defendant Johnson City had raised the comparative fault of Frizzell as an affirmative defense. In a post-trial Motion, the plaintiff's attorney sought to correct this error. However, at defendant's urging, the Court ruled that it had lost jurisdiction of the case to the appellate process. We vacate the award of damages and remand with directions to the Trial Court on this record, without hearing further proof, to determine the total amount of damages to which plaintiff would be entitled, and then determine the percentage of fault, if any, attributable to Frizzell, and then enter Judgment against defendant, based upon the percentage of fault attributed to the City in accordance within the constraints of the Governmental Tort Liability Act. . . .

*Id*. at 585.

Although Tennessee has not yet had the opportunity to specifically address this question in the context of a personal injury case, other jurisdictions that have addressed the interaction between a damages cap and principles of comparative fault have almost unanimously held that any reduction or allocation based on comparative fault must be done before applying the statutory cap where a plaintiff's damages are subject to reduction based on his or her comparative fault.[7] *See, e.g.,* **In re Asbestos Litigation**, Nos. 91-MD-875, 04-

---

[7] As discussed in 1 Jacob A. Stein, Stein on Personal Injury Damages § 4:43 (3d ed. 2014):

> A Texas Court of Appeals held that the statutory punitive damages

43

CV-2405, 2013 WL 424687 (E.D.N.Y. Jan. 22, 2013) ("The starting point for imposing applicable caps will be the total award determined by the jury for the cause of action. Where the jury allocates fault . . . pursuant to the comparative negligence statute, the court will first reduce each defendant's damages so they are proportionate to the percentage of fault attributable to that specific defendant. What remains after deduction of any percentage of the [uncapped] damage award imputed to [the defendant] is the 'aggregate sum' to which the statutory cap is applied. If the fault attributed to a defendant on an award subject to the statutory cap is less than $250,000, no further deduction need be applied" (internal citations omitted)); *General Elec. Co. v. Niemet,* 866 P.2d 1361 (Colo. 1994) (holding that, in cases involving multiple defendants or plaintiff who is partially at fault, the trial court should ascertain pro rata liability of defendants and plaintiff before applying statutory cap on non-economic damages);[8] *Collins v. Commonwealth of Ky. Natural Resources and*

---

> cap of four-times actual damages is calculated using actual damages amount awarded by jury, not amount reduced after comparative fault calculation. The jury awarded plaintiff $2.5 million on plaintiff's defective design claim against the manufacturer of a radial saw without a lower blade guard. The jury found that plaintiff sustained $592,704.91 in damages and award $2 million in punitive damages. Because the jury found plaintiff 30 percent liable, however, the damages amount was reduced to $414,893.44. Defendants argued that $2 million in punitives exceeded four times $414,893.44, and therefore must be reduced. The Texas Court of Appeals held that the cap applied to the damage award prior to reduction for comparative fault. *Sears, Roebuck & Co. v. Kunze*, 996 S.W.2d 416 (Tex. App. Beaumont 1999), reh'g overruled, (Oct. 7, 1999) and petition for review filed, (Nov. 23, 1999).

*Id.* From our research, Texas is the only jurisdiction that has specifically held that the damages cap applies **before** comparative liability percentages.

[8] We note that Chief Justice Rovira and Justice Lohr filed a separate dissent in *Niemet*, arguing:

> The majority holds that the statutory cap for noneconomic damages applies to individual defendants, and therefore, it does not act as a cap on the total amount of noneconomic damages awarded to a plaintiff. In so holding, the majority concludes that in cases involving multiple defendants a trial court must first apportion liability to the appropriate parties, pursuant to the pro rata liability statute, and then apply the statutory cap for noneconomic damages to each individual defendant. Maj. op. at 1362. I disagree with this interpretation. Section

44

*Environmental Protection Cabinet*, 10 S.W.3d 122 (Ky. 1999) (holding that where damages totaled $900,000 and decedent was found to be 80% comparatively negligent, Board erred when it calculated damage award by first reducing the damages to the $100,000 statutory cap and then further reducing this figure to $20,000 due to decedent's comparative negligence where the proper procedure is to apply reduction for comparative negligence to total amount of damages and then limit recovery to statutory maximum); *Hall v. Brookshire Bros., Ltd.*, 848 So.2d 559 (La. 2003) (holding that, in a case covered by the Louisiana Medical Malpractice Act, comparative fault is allocated prior to application of the damages cap); *Brown v. Crown Equipment Corp.*, 960 A.2d 1188, 1195 (Me. 2008) ("A jury's finding of comparative negligence should be applied before any statutorily mandated caps on [loss of consortium] damages are subtracted from the total amount of damages."); *McAdory v Rogers*, 264 Cal.Rptr. 71 (2nd Dist. 1989) (holding that when a percentage of fault has been attributed to a malpractice plaintiff, the jury's verdict should be reduced by the percentage of fault attributable to the plaintiff before the statutory limitation on damages is applied); *Gann v. Joeckel*, 884 P.2d 451 (Kan. Ct. App. 1994) (holding that the then-existing $100,000 cap on non-economic damages in the Kansas wrongful death statute is applied after any reduction of the total non-economic damages to reflect the decedent's or the plaintiff's comparative fault); *Guiliani v. Shehata*, 19 N.E.3d 971 (Ohio Ct. App. 2014) (holding that trial court properly applied jury's comparative fault finding in medical malpractice action before, rather than after reducing non-economic damage award under statute placing cap of $250,000 on recovery of non-economic damages).

We adopt the reasoning in the foregoing cases, which represent the holdings of the majority of jurisdiction that have specifically addressed this question. Accordingly, we hold, as a matter of law, that, in personal injury cases, the trial court should first reduce the jury's award of non-economic damages by the percentage of comparative fault, and then, if the adjusted award is still above the statutory cap, the court should reduce the award further to comport with the cap.

---

13–21–102.5, 6A C.R.S. (1987 & 1993 Supp.), which creates the statutory cap for noneconomic damages, is clear and unambiguous. The statute is intended to limit a plaintiff's total recovery for noneconomic damages regardless of the number of defendants involved. Thus, in my view, a trial court should apply the statutory cap for noneconomic damages prior to apportioning liability among the defendants. Further, this application of the statutory cap is not inconsistent with the purposes inherent in the pro rata liability statute.

*Niemet,* 866 P.2d at 1368.

45

### K. Reduction of Verdict by Policy Amounts Paid

State Farm further asserts that it is entitled to a reduction of the total judgment by the amount of the pre-verdict payments it made to the Sadowskis. Specifically, it requests a credit for the $5,000 it paid in medical coverage payments and $20,000 in death benefits. This issue rests upon an interpretation of the insurance policy entered by and between the Sadowskis and State Farm. The policy was made part of the record as an exhibit to Plaintiffs' response to State Farm's motion for new trial. The policy provides, in relevant part:

> 12. Our right to Recover Our Payments
> Death, Dismemberment and Loss of Sight Coverage and Loss of Earnings Coverage payments are not recoverable by us. Under all other coverages the following apply:
>
> a. Subrogation
>
> If we are obligated under this policy to make payment to or for a person who has a legal right to collect from another party, then we will be subrogated to that right to the extent of our payment.
>
> The person to or for whom we make payment must help us recover our payments by:
> (1) doing nothing to impair that legal right;
> (2) executing any documents we may need to assert that legal right; and
> (3) taking legal action through our representatives when we ask; and
>
> b. Reimbursement
>
> If we make payment under this policy and the person to or for whom we make payment recovers or has recovered from **another party**, then that person must:
> (1) hold in trust for us the proceeds of any recovery; and
> (2) reimburse us to the extent of our payments.

(Emphasis added).

In ***Garrison v. Bickford***, our Supreme Court set out the principle guiding the

interpretation of insurance policies:

> Equally well-established is the principle that "[i]nsurance policies are, at their core, contracts." As such, courts interpret insurance policies using the same tenets that guide the construction of any other contract. Thus, the terms of an insurance policy " 'should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.' " The policy should be construed "as a whole in a reasonable and logical manner," and the language in dispute should be examined in the context of the entire agreement.

*Garrison v. Bickford*, 377 S.W.3d 659 663-64 (Tenn. 2012) (internal citations omitted). Applying the *Garrison* holding to the policy at issue here, it is clear that the first sentence of paragraph 12 precludes State Farm from recovering the $20,000 death benefits paid on behalf of Mrs. Sadowski (i.e., "Death . . . payments **are not recoverable by us**" (emphasis added)).

Concerning the $5,000 in medical payments, in order to recover this amount, the reimbursement clause (i.e., paragraph 12b of the policy) would need to apply. The Sadowskis, however, did not recover any funds "from another party," which is the triggering event for State Farm's right to reimbursement. Rather, because State Farm defended under the uninsured motorist section of the policy, and because State Farm itself, as opposed to another person, paid these amounts, which were never subsequently recouped from another tortfeasor, the plain language of the policy precludes State Farm's recovery of the $5,000.

### L. Discretionary Costs

Finally, we consider State Farm's issue concerning whether the trial court erred in granting Plaintiffs' motion for discretionary costs. We review a trial court's decision to award discretionary costs for an abuse of discretion. *Quebecor Printing Corp. v. L & B Mfg. Co.*, 209 S.W.3d 565, 583 (Tenn. Ct. App. 2006). As this Court has explained:

> Tenn. R. Civ. P. 54.04(2) permits prevailing parties in civil actions to recover "discretionary costs." The purpose of this provision is not to punish the losing party but rather to help make the prevailing party whole. *Owens v. Owens*, 241 S.W.3d 478, 496–97 (Tenn.Ct.App.2007); *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 85 (Tenn.Ct.App.2000). The particular equities of

the case may influence a trial court's decision to award discretionary costs, ***Perdue v. Green Branch Mining Co.***, 837 S.W.2d 56, 60 (Tenn.1992), and, therefore, parties are not entitled to discretionary costs simply because they prevail. ***Scholz v. S.B. Int'l, Inc.***, 40 S.W.3d at 85; ***Sanders v. Gray***, 989 S.W.2d 343, 345 (Tenn. Ct. App.1998).

The party seeking discretionary costs has the burden of convincing the trial court that it is entitled to these costs. ***Carpenter v. Klepper***, 205 S.W.3d 474, 490 (Tenn.Ct. App.2006); ***Stalsworth v. Grummons***, 36 S.W.3d 832, 835 (Tenn.Ct.App.2000). As a general matter, a party seeking discretionary costs can carry its burden by filing a timely and properly supported motion demonstrating (1) that it is the prevailing party, (2) that the costs being sought are included in Tenn. R. Civ. P. 54.04(2), (3) that the costs are necessary and reasonable, and (4) that it has not engaged in conduct during the litigation that would justify depriving it of the costs it is requesting. ***Trundle v. Park***, 210 S.W.3d 575, 582 (Tenn.Ct.App.2006); ***Waggoner Motors, Inc. v. Waverly Church of Christ***, 159 S.W.3d 42, 65–66 (Tenn.Ct.App.2004); ***Mass. Mut. Life Ins. Co. v. Jefferson***, 104 S.W.3d 13, 35–36 (Tenn. Ct. App. 2002).

***Duran v. Hyundai Motor America, Inc.***, 271 S.W.3d 178, 214-15 (Tenn. Ct. App. 2008).

In pertinent part, Tennessee Rule of Civil Procedure 54.04, provides:

Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees not paid pursuant to Tennessee Supreme Court Rule 42, and guardian ad litem fees; travel expenses are not allowable discretionary costs . . . .

Tenn. R. Civ. P. 54.04(2).

State Farm argues that the award of $7,100 for the costs of the testimony of the Sadowskis' treating physicians was improper because the physicians are not "experts," as

48

contemplated by the Rules of Civil Procedure. The cases relied upon by State Farm in its appellate brief, i.e., *Alessio v. Crook*, 633 S.W.2d 770 (Tenn. Ct. App. 1982) and *Small ex rel. Russell v. Shelby County Schools*, No. W2007-00045-COA-R3-CV, 2008 WL 360925 (Tenn. Ct. App. Feb. 12, 2008), stand only for the proposition that treating physicians should not be considered "expert witnesses" for purposes of pre-trial disclosure under Tennessee Rule of Civil Procedure 26. Rather, an expert for Rule 26 purposes develops his or her opinion "in anticipation of litigation or for trial." Tenn. R. Civ. P. 26.02(4). A treating physician develops his or her opinions in the course of treating a patient and, thus, parties are not required to fashion discovery requests in accordance with Rule 26.02(4) in order to learn the identity and opinions of a treating physician. *See Alessio*, 633 S.W.2d at 779-80; *see also Buckner v. Hassell*, 44 S.W.3d 78, 84 (Tenn. Ct. App. 2001) (distinguishing *Alessio* where a treating physician was "rendered . . . an expert witness under Tennessee Rule of Civil Procedure 26" when he considered matters outside his treatment of the plaintiff in rendering his opinion on the standard of care). In short, State Farm's reliance on cases addressing the definition of "expert" for Rule 26 purposes is misplaced. Merely because treating physicians are not "experts" under Rule 26 does not, *ipso facto*, mean that they are not experts for other purposes. For example, a treating physician may be considered an "expert" as that term is used in Tennessee Rule of Evidence 702 because of his or her "specialized knowledge" in the areas of medical treatment. Furthermore, in personal injury lawsuits, "plaintiffs must present competent **expert** testimony" to establish that the medical expenses plaintiff incurred are "necessary and reasonable." *Borner v. Autry*, 284 S.W.3d 216, 218 (Tenn. 2009); *see also Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897, 901 (Tenn. Ct. App. 2001) (holding that causation of medical condition must be established by a medical expert). Typically, this "expert testimony" to meet the personal injury plaintiff's burden is supplied by the treating physician. Here, the testimonies of Dr. Jain and Dr. Mohan were "necessary" to Plaintiff's proof. Without these witnesses, Plaintiffs would not have shown that the medical costs were necessary and reasonable or that they were related to the accident. Accordingly, we cannot hold that the trial court abused its discretion in awarding Plaintiff's discretionary costs for this testimony under Tennessee Rule of Civil Procedure 54.04(b).

## V. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, State Farm Mutual Insurance Company, and its surety, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE